[Civ. No. 5224. Fifth Dist. July 15, 1982.]

DIANE M. KENNEMUR et al., Plaintiffs and Appellants, v.
THE STATE OF CALIFORNIA, Defendant and Respondent.

COUNSEL

Thomas T. Anderson and Douglas P. Miller for Plaintiffs and Appellants.

Richard G. Rypinski, Gordon S. Baca and Ronald I. Harrison for Defendant and Respondent.

OPINION

**FRANSON, Acting P. J.**—This appeal presents two questions of importance to the trial bar: (1) the meaning of the phrase "the general

substance of the testimony which the witness is expected to give" as provided in Code of Civil Procedure section 2037.3[1] governing the contents of expert witness exchange lists; and (2) the meaning of the word "impeachment" as used in section 2037.5 governing the testimony of an expert witness on rebuttal where the general substance of the witness' proposed testimony was not disclosed before trial as required by section 2037.3. We hold the trial judge properly construed the meaning of these sections so that appellant's expert witnesses were not permitted to rebut the opinion testimony of respondent's expert. We affirm the judgment.

Plaintiffs, Diane M. Kennemur (hereinafter appellant) and Robert Kennemur appeal from a judgment on a verdict in favor of defendant, State of California (hereinafter respondent). Appellant's action is based on the California Tort Claims Act (Gov. Code, § 810 et seq.). Mr. Kennemur filed an action for loss of consortium. Appellant contended at trial that respondent was liable because it failed to prevent, remedy, or adequately warn of a known dangerous condition of public property, i.e., ice on a state highway.

The evidence is summarized as follows. At approximately 6 a.m. on the morning of December 16, 1975, appellant, driving alone, was involved in a two car collision on a curve on State Route 41 between Oakhurst and Coarsegold. Appellant was driving southbound in a 1974 Volkswagen Super Beetle (VW). Fritz Starner was traveling northbound in a 1975 Mustang with his wife, Paulette, who was in the front passenger seat. As the Mustang rounded a curve, the VW crossed over the centerline directly into the path of the Mustang striking the Mustang at an angle. Mr. Starner's statements conflicted over whether the VW was skidding when it crossed over the centerline. Mrs. Starner testified that she did not see the VW skid, but just before impact it made "a very sharp turn . . . into our lane." Appellant suffered severe permanent injuries including brain stem damage which left her a quadriplegic. Appellant was still in a coma at the time of the trial, three and one-half years after the accident.

There was conflicting testimony regarding the presence of ice on the roadway at the time of the collision. Several witnesses said there was ice, others said it was frosty but there was no ice. California Highway Patrol Officer Gilliland, who arrived at the scene about 30 minutes after the accident, reported the roadway conditions as "weather clear,

---

[1]All references are to the Code of Civil Procedure unless otherwise indicated.

roadway had icy spots." The officer indicated the roadway was covered with frost, but it was not covered with a sheet of ice. His testimony was inconsistent on whether there were "icy spots" at the scene.

As part of the defense case, respondent called Paul O'Shea, a consulting engineer specializing in accident reconstruction, as an expert witness. O'Shea testified on two issues relating to the collision. First, he commented on the mechanics of the seatbelt the VW was equipped with. (Appellant was not wearing a seatbelt at the time of the accident; after the initial impact with the Mustang, she was thrown from the VW, and it was impossible to determine at what point in the accident she was injured.) Second, O'Shea expressed the opinion that the accident was caused "because the driver put for some reason an excessive amount of left steer into the vehicle, crossed into the oncoming lane, and the vehicle coming along its own lane hit it. It's just that simple." O'Shea based his opinion on certain tire tracks depicted in several photographs taken by the California Highway Patrol officer at the scene of the accident[2] and on the testimony of Mrs. Starner who saw the VW coming across the centerline.

After O'Shea's testimony, respondent rested. Appellant then attempted to call various expert witnesses in rebuttal; a lengthy argument ensued between the respective parties and the court.

Respondent first objected to appellant calling Ted Mitchell in rebuttal. Mitchell was an accident reconstruction expert whose name had been revealed pursuant to a court order dated January 18, 1979; however, appellant had not disclosed to respondent the general substance of the testimony which Mitchell was expected to give at trial. Respondent deposed Mitchell on three separate occasions, the last time being six days after appellant deposed the defense expert O'Shea. In his first deposition conducted prior to the court order in April 1978, Mitchell indicated he was dealing exclusively with Volkswagen of America, a defendant in the case at that time. He was concerned about such things as the overall stability of the VW, and whether the door latch was a defec-

---

[2]Officer Gilliland took several photographs of the accident scene which depicted tire tracks crossing the centerline of the highway going toward the point of impact. These photographs, however, were taken after other vehicles had traveled the roadway following the accident. Officer Gilliland testified in response to questioning by appellant's counsel that he could not tie the tire tracks crossing the centerline to the VW; the tracks could have been "from the VW *or* from other vehicles that had already gone by." (Italics added.)

tive product. Mitchell testified that as far as the roadway was concerned, he was going to leave that portion of the accident reconstruction to another expert, Al Weber. Respondent quoted from Mitchell's first deposition wherein he was questioned as follows: "'Q. What caused the VW to cross the centerline? A. Again that is Mr. Weber's area.'" Finally, Mitchell said he had made no attempt to study the roadway conditions in order to reconstruct the accident.

Mitchell was again deposed on March 9, 1979, and asked: "'Q. Have you attempted to make any assumptions regarding whether there was ice at the scene or the extent of ice in reference to your own accident reconstruction? A. No. Q. So that is something that you have to do in the future? A. That is up to Mr. Weber.'"

At Mitchell's third deposition conducted on June 28, 1979, six days after O'Shea's deposition was taken by appellant and approximately six weeks before trial, Mitchell was questioned by respondent as follows:

"'I just want to talk to you, Mr. Mitchell, apparently since your deposition was last taken in March of '79, you haven't done anything that would be concerned with investigating the roadway conditions and what effect they may or may not have had in connection with this accident. Would that be correct?

"'A. That's correct.

"'Q. So since March 17, of '79, all you have done is these tests you have just been testifying about at some length today concerning the doors of the Volkswagen, is that correct?

"'A. That's correct.

"'.    .    .    .    .    .    .    .    .    .    .    .    .

"'Q. Outside of something that Mr. Anderson may come up with after this date as you sit here today you have no plan of your own to do anything additional in the way of accident reconstruction, is that correct?

"'A. That's correct.

"'Q. And that would include investigation of roadway conditions for what effect they may or may not have had in this accident?

"'A. That's correct.

"'Q. At this time do you have any appointment or anything to talk to Mr. Weber about this case?

"'A. No, I do not.'"

On the basis of the deposition evidence, respondent argued that Mitchell had consistently limited his testimony to the condition of the VW as a cause of the accident. Nevertheless, Mitchell apparently was going to testify in rebuttal to O'Shea's testimony concerning the tire marks and the roadway conditions. This "sandbagging" violated the discovery order because Mitchell had never indicated via his depositions that he would testify as an expert on accident reconstruction relating to the highway conditions.

Appellant's counsel, Thomas Anderson, responded by arguing that since Mitchell had testified at his depositions about accident reconstruction facts, including energy absorption and impact damage, it was evident that respondent knew Mitchell would testify about accident reconstruction.[3]

When the trial judge indicated he would not permit Mitchell to testify in rebuttal, Anderson changed his approach by declaring, "[Mitchell] was not concerned nor are we going to ask him anything about any dangerous condition of the roadway because he is not an expert in that field." Anderson said he was not going to have Mitchell reconstruct the accident in rebuttal. "The only thing we're going to do is to rebut the testimony of Mr. O'Shea. That's all. Totally."

---

[3]Anderson relied on the following testimony from the April 1978 deposition:
"'Q. Mr. Mitchell, after having been retained some time in January, 1976, what were you asked to do in the case?
"'A. I was asked to inspect the scene of the accident and inspect the Volkswagen that was involved in the accident and to reconstruct if possible what occurred. *Specifically in regard to the automobile itself.*
"'Q. All right. What information were you provided regarding the accident circumstances?
"'A. The police report and the photographs which you have referred to that were taken at the time of the accident. I believe that was all at that time.'" (Italics added.)

The trial judge responded in part, "but [if] none of the rebuttal is going to have anything to do with reconstructing the accident. That doesn't mean anything." Anderson replied that Mitchell was going to discuss the tire marks. The judge remarked, "You are going to. be reconstructing the accident then." Anderson replied, "Well, no. No, we are going to be talking about how the vehicle came [across the line]." Anderson argued that the respondent's expert had already given his opinion about how the cars collided.

Anderson argued that under section 2037.5 impeachment was synonymous with rebuttal. The judge stated he did not agree with Anderson's analysis, but he indicated Mitchell could take the stand to attack the credibility of O'Shea under section 780 of the Evidence Code.

Anderson then asked for a continuance to allow respondent to depose Mitchell. Respondent objected that a continuance was not justified because allowing Mitchell to testify as an accident reconstruction expert "for all purposes" would circumvent the discovery order and the intent of sections 2037-2037.6.

The judge then said, "I don't see how I can get around that. So it is my ruling that the witness can testify in impeachment which is permitted by Code, but to go beyond that, to general rebuttal, I think would be improper and that's what my ruling is."

Anderson then told the court he was going to call James Gallion, an accident reconstruction expert whose name had not been revealed during discovery, for the purpose of rebutting the testimony of O'Shea. The judge ruled that Gallion could be called to impeach O'Shea.

Anderson next declared he was going to call Al Weber as a rebuttal witness. Respondent pointed out that Weber was a traffic engineer and that respondent had not put on any traffic engineering testimony in its case in chief. Weber had also indicated in his deposition that he was not an accident reconstruction expert. Thus, Weber could only rebut something that fell within his area of expertise. The judge ruled that Weber could present rebuttal testimony regarding the road signs because that was within his area of expertise, but that he could not rebut the testimony of O'Shea.

Anderson asked the judge if his witnesses, Mitchell and Gallion, would be able to impeach O'Shea's testimony "substantively," i.e., could

they rebut O'Shea's testimony concerning the fact the marks he had made reference to did not come from the Volkswagen. The judge responded, "I don't know why you should . . . we would have to differentiate between impeachment and attack upon Mr. O'Shea's credibility in simply rebutting his testimony, and they are different things. Impeachment can certainly be rebuttal, but not all rebuttal is impeachment." . Anderson responded, "I understand that reasoning. So then if I understand your Honor correctly the order is that anything that substantively goes to contradicting or you might term it impeaching or whatever you want to call it, substantively the testimony of Mr. O'Shea from expert witnesses, mainly, Mr. Mitchell or Mr. Gallion would be precluded." The court responded, "Yes." Anderson then indicated that he would not call any witnesses in rebuttal.

## DISCUSSION

The evolving status of an expert consultant who possibly may be called as a witness at trial is articulated with clarity in *Swartzman* v. *Superior Court* (1964) 231 Cal.App.2d 195, 203 [41 Cal.Rptr. 721]: "[T]he initial status of the expert, as consultant and possible witness, changes its character at that point in the suit when it has become known he will actually testify as a witness. When it becomes reasonably certain an expert will give his professional opinion as a witness on a material matter in dispute, then his opinion has become a factor in the cause. At that point the expert has ceased to be merely a consultant and has become a counter in the litigation, one to be evaluated along with others. Such evaluation properly includes appropriate pretrial discovery." (See also *Bolles* v. *Superior Court* (1971) 15 Cal.App.3d 962, 963 [93 Cal.Rptr. 719]; Jefferson, Cal. Evidence Benchbook (1972) § 41.1, pp. 704-709.)

Professor Hogan further explains: "The right to engage in discovery of the opinion of the experts who will appear as witnesses for one's opponent at the trial of the case is not at all contingent on a showing that the one seeking discovery does not have equal access to the facts upon which such expert's opinion is based. Rather it stems from the necessity of preparing to cope with that expert when he does take the witness stand at trial. The decision that a particular consultant will be called to the witness stand means that the other side must gear up for the cross-examination of that expert and must marshall evidence to rebut his opinion. If anything, the need for pretrial discovery as an aid to the preparation of cross-examination and rebuttal is greater with respect to

the expert witness than it is in the case of an ordinary fact witness . . . ." (2 Hogan, Modern Cal. Discovery 3d (1981) § 12.12, p. 421, fn. omitted.)

In 1978, effective January 1, 1979, the Legislature enacted an elaborate scheme regulating discovery of the opinions of experts who will be called at trial. (Code Civ. Proc., §§ 2037-2037.9, added by Stats. 1978, ch. 1069, § 1, pp. 3285-3287.)[4] Section 2037.1 establishes the requisite dates for exchange of the parties' expert witness lists. Section 2037.3 provides, "Each witness list shall include the name and business or residence address of each expert witness whom the party expects to call in person or through deposition and a brief narrative statement of the qualifications of such witnesses *and the general substance of the testimony which the witness is expected to give.*" (Italics added.)

Section 2037.5 provides the sanction to be imposed when either an expert witness who is called to testify is not included in the party's list of designated expert witnesses, or the information required by section 2037.3 for such a witness is not included in the list served: "Except as provided in Section 2037.6, upon objection of a party who has served his list of witnesses in compliance with Section 2037.2, no party required to serve a list of expert witnesses on the objecting party may call an expert witness to testify, *except for purposes of impeachment, unless the information required by Section 2037.3 for such witness is included in the list served.*" (Italics added.)

Section 2037.6 provides in pertinent part: "(a) The court may, upon such terms as may be just (including but not limited to continuing the trial for a reasonable period of time and awarding costs and litigation expenses), permit a party to call a witness, or permit a witness called by

---

[4]The exchange of the names of the expert witnesses in the present case was not made under the statutory procedure enumerated in the 1978 expert witness discovery legislation. (The statutory exchange is triggered by the service of a demand by one party on another party to exchange the lists (§ 2037).) Here, the exchange was pursuant to a discovery order entered by the superior court following a pretrial conference on January 8, 1979, some seven days after the effective date of the 1978 legislation. The discovery order directed the parties to "declare the identity of all experts they intend to call at trial" within a specified number of days and thereafter to make their experts available for deposition by opposing counsel. The order further provided "no party shall be permitted to call any expert witness not declared and made available for deposition . . . ."

Nevertheless, both at trial and on appeal appellant acknowledges that the "impeachment" sanction of section 2037.5 applies to Mitchell's rebuttal testimony if he did not disclose the substance of his expected testimony during his depositions. Accordingly, we will assume that the provisions of sections 2037.3, 2037.5 and 2037.6 govern this case.

a party to testify to an opinion or data on direct examination, during a party's case in chief where such witness, is required to be, but is not, included in such party's list of expert witnesses so long as the court finds that such party has made a good faith effort to comply with Sections 2037 through 2037.3, inclusive, that he has complied with Section 2037.4, and that as of the date of exchange he:

"(1) would not in the exercise of reasonable diligence have determined to call such witness; or

"(2) failed to determine to call such witness through mistake, inadvertence, surprise or excusable neglect."

Section 2037.6 applies where a party seeks to call an undesignated witness as part of his case in chief, which is not the case before us.

Section 2037.5 applies to those situations where a party calls an expert witness in rebuttal. The expert's testimony is limited to "impeachment" if the witness was either undesignated, or, as in the instant case, the designation (or subsequent depositions or interrogatories) does not contain all of the information required by section 2037.3. (See Hogan, *supra*, § 12.12, p. 428.)

The decisive fact in the present case is appellant's failure to disclose Mitchell's expected testimony concerning the tire tracks either at Mitchell's deposition or as required by section 2037.3.[5] This failure deprived respondent of the opportunity to prepare for Mitchell's cross-examination and for possible rebuttal (surrebuttal) of his testimony. Mr. Anderson obviously knew before the trial that O'Shea would give his opinion for the defense (Anderson personally deposed O'Shea two months before trial and learned that he held the opinion that the tire tracks belonged to the VW); thus, when Anderson decided he would use Mitchell at trial to rebut O'Shea's opinion, he was required to disclose

---

[5]If appellant had disclosed Mitchell's opinion concerning the tire tracks in his deposition, the statutory noncompliance would have been harmless since respondent would have been afforded the opportunity to prepare for cross-examination and rebuttal of Mitchell's opinion. For example, *respondent* also failed to comply with section 2037.3 with respect to Mr. O'Shea's testimony because the general substance of O'Shea's proposed testimony was not included in the witness exchange list. Nevertheless, during O'Shea's deposition he opined that the tire tracks belonged to the VW and stated his reasons in support of that opinion; thus, appellant was afforded the opportunity of preparing for O'Shea's cross-examination, thereby rendering harmless respondent's noncompliance with section 2037.3.

to respondent the substance of Mitchell's opinion and offer him for deposition. (§ 2037.4; *Swartzman v. Superior Court, supra,* 231 Cal. App.2d at p. 203.) Having failed to disclose Mitchell's proposed opinion before trial, appellant was bound by the limitations of sections 2037.5 and 2037.6.

Appellant cites *Meyer v. Cooper* (1965) 233 Cal.App.2d 750, 754 [44 Cal.Rptr. 57], for the proposition that the only duty imposed upon the party whose witness is being deposed is to make the witness and his reports available for examination; the witness is under no obligation to volunteer information or to disclose relevant and material matters not requested. The examining party has the duty of inquiry into all areas of relevant concern. Since respondent knew that Mitchell was an accident reconstruction expert, the state should have anticipated that Mitchell would form an opinion contrary to O'Shea's concerning the tracks in the photographs. Thus, it was unfair to penalize appellant for respondent's failure to examine Mitchell concerning the tire tracks at the June 28th deposition.

Although the principles articulated in *Meyer v. Cooper* are sound, they do not govern a party's duty of disclosure under section 2037.3. The Legislature has singled out the pretrial discovery of expert opinions for special treatment. ▪ When appropriate demand is made for exchange of expert witness lists, the party is required to disclose not only the name, address and qualifications of the witness but the *general substance* of the testimony the witness is expected to give at trial. (§ 2037.3.) In our view, this means the party must disclose either in his witness exchange list or at his expert's deposition, if the expert is asked, the substance of the facts and the opinions which the expert will testify to at trial. Only by such a disclosure will the opposing party have reasonable notice of the specific areas of investigation by the expert, the opinions he has reached and the reasons supporting the opinions, to the end the opposing party can prepare for cross-examination and rebuttal of the expert's testimony. Only by such a disclosure will the possibility of a reasonable settlement of the case before trial be encouraged. (See *Greyhound Corp. v. Superior Court* (1961) 56 Cal.2d 355 [15 Cal. Rptr. 90, 364 P.2d 266].)[6] ▪ The fact that early in the lawsuit Mitchell had been given copies of the California Highway Patrol acci-

---

[6]Our interpretation of the meaning of section 2037.3 accords with the 1970 amendments to the Federal Rules of Civil Procedure which provide that a party may through *interrogatories* require any other party to identify each person whom the other party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify, and to state the substance of the facts and opinions to which

dent report and the photographs showing the tire tracks and that Mitchell had calculated energy absorption and impact damage concerning the VW, does not mean he had analyzed the tracks or the condition of the highway as a cause of the accident. To the contrary, he specifically testified at his deposition that he had not investigated that phase of the accident. Respondent was entitled to rely on Mitchell's disclaimer until such time as appellant disclosed that Mitchell had conducted a further investigation and had reached additional opinions in a new area of inquiry.

Even if we accept Mr. Anderson's assertion that he honestly believed he would be able to call Mitchell at trial without any restrictions since he had disclosed Mitchell as an accident reconstruction expert from the outset, Anderson was put on notice at the beginning of the trial that respondent would object to Mitchell reconstructing the accident insofar as the roadway conditions were concerned. (Anderson agreed not to mention Mitchell in his opening statement.) If at this point Anderson had disclosed Mitchell's opinion concerning the tire tracks and had offered Mitchell for deposition, we can only assume the motion would have been granted since it involved only one witness and a limited subject matter. ██ ██ ██ The deposition could have been taken after court hours, thereby avoiding any disruption of the trial proceedings.[7] ██ Anderson, however, apparently decided to keep Mitchell in the closet until such time as O'Shea gave his opinion that the tracks belonged to the VW. By not offering Mitchell for deposition until after the defense had rested its case and the trial court had expressed its intent to impose the impeachment sanction of section 2037.5, Anderson set the stage for the trial court's reasonable exercise of its discretion denying the requested continuance for deposition purposes. (Appellant does not contend the trial court abused its discretion in refusing the continuance.)

the expert is expected to testify and a summary of the grounds for each opinion. (Fed. Rules Civ. Proc., rule 26(b)(4)(A)(i) [28 U.S.C.].) As to federal cases which would be pertinent on the "general substance" requirement of section 2037.3, see 2 Hogan, Modern California Discovery, *supra*, section 12.12, page 425.

[7]We recognize that section 2037.6, which authorizes the trial court to relieve a party from the impeachment sanction of section 2037.5 under certain conditions, is limited on its face to the situation where the witness is *undisclosed* and the party wishes to call the witness on direct examination *as part of its case in chief*. Nevertheless, where a party intends to call a disclosed expert on general rebuttal as in the present case, the trial court has a similar discretion under California Rules of Court, rule 222, to authorize the taking of the expert's deposition upon a showing of reasonable diligence in making the request and upon terms of fairness to the opposing party.

■ We turn now to the critical question: what is meant by "impeachment" as the term is used in section 2037.5? Appellant contends any evidence offered by his expert witnesses in rebuttal which would "substantively" contradict the testimony of O'Shea constitutes impeachment. Appellant argues that a party should be given wide latitude in impeaching an expert witness and equates impeachment with general rebuttal, i.e., Mitchell's opinion that the tracks did not belong to the VW in a broad sense would have challenged the truthfulness of O'Shea's entire testimony. Appellant paints with too broad a brush.

The word "impeach" in a general sense means "To dispute, disparage, deny, or contradict." (Black's Law Dict. (5th ed. 1979) p. 886.) Arguably, this definition would support appellant's contention that under section 2037.5 a witness should be allowed to testify in general rebuttal to the opponent's case regardless of the fact the witness' proposed testimony has not been disclosed before trial. In the law of evidence, however, the word "impeachment" has a more restricted meaning. It means, "To call in question the *veracity* of a witness, by means of evidence adduced for such purpose, or the adducing of proof that a witness is *unworthy of belief.*" (*Ibid.*, italics added.)

Evidence Code section 780 recites most of the commonly used methods of impeaching the credibility of a witness. The statute provides: "Except as otherwise provided by statute, the court or jury may consider in determining the credibility of a witness *any matter* that has any tendency in reason to prove or disprove *the truthfulness* of his testimony at the hearing, including but not limited to any of the following:" (Italics added.)[8]

---

[8]"(a) His demeanor while testifying and the manner in which he testifies.

"(b) The character of his testimony.

"(c) The extent of his capacity to perceive, to recollect, or to communicate any matter about which he testifies.

"(d) The extent of his opportunity to perceive any matter about which he testifies.

"(e) His character for honesty or veracity or their opposites.

"(f) The existence or nonexistence of a bias, interest, or other motive.

"(g) A statement previously made by him that is consistent with his testimony at the hearing.

"(h) A statement made by him that is inconsistent with any part of his testimony at the hearing.

"*(i) The existence or nonexistence of any fact testified to by him.*

"(j) His attitude toward the action in which he testifies or toward the giving of testimony.

"(k) His admission of untruthfulness." (Italics added.)

We decline to give the word "impeachment," as used in section 2037.5, the broad meaning argued by appellant. In our view, the Legislature intended the word to have the meaning provided in Evidence Code section 780, i.e., any matter going to the truthfulness of the testimony of the witness to be impeached.

■ The difference between impeachment and general rebuttal testimony becomes clear when we analyze O'Shea's opinion. O'Shea ultimately opined that for some reason the appellant *steered* the VW abruptly across the centerline. This opinion was based entirely upon another opinion—that the tracks crossing the centerline in the photographs belonged to the VW. The latter opinion was not a fact but only an inference drawn by O'Shea from the location of the tracks in the photographs and the testimony of Mrs. Starner who observed the accident.

On cross-examination, O'Shea was impeached by his deposition testimony where he acknowledged that from the photographs he could not visually tie the centerline tracks to the centrifugal marks made by the VW after impact.

Anderson then attempted to call his expert Mitchell on rebuttal to directly contradict O'Shea's opinion. We glean from the record that Mitchell was prepared to express the opposite opinion that the tracks in the photographs did *not* belong to the VW and his reasons for such an opinion. This, of course, would have been beyond the scope of impeachment of O'Shea and would have constituted general rebuttal of O'Shea's opinion, which is not permitted under section 2037.5. ■ As stated in *Ellenberger* v. *Karr* (1982) 127 Cal.App.3d 423, 427 [179 Cal.Rptr. 583], "calling an expert witness to express an opinion contrary to that expressed by another expert witness is not the 'impeachment' contemplated by section 2037.5." (See also *Davis* v. *Chew* (1979) 95 Cal.App. 3d Supp. 13, 17 [157 Cal.Rptr. 653].)

Appellant narrows her argument by asserting that Mitchell and Gallion's testimony was proper impeachment under *subdivision (i)* of Evidence Code section 780 since it would have proved the "nonexistence of a fact" testified to by O'Shea—that the tracks belonged to the VW. Although the argument has some merit superficially, it fails upon analysis.

A party may impeach an expert witness by *contradiction*, i.e., by showing the falsity of any matter upon which the expert based his opin-

ion. This can be done either by cross-examination of the expert or by calling other witnesses to offer evidence showing the nonexistence or error in the data upon which the first expert based his opinion. (See Evid. Code, §§ 721, subd. (a), 780, subd. (i), 801, subd. (b); Witkin, Cal. Evidence (2d ed. 1966) §§ 1217, 1223, 1258, pp. 1125-1126, 1129-1130, 1161-1162; Jefferson, Cal. Evidence Benchbook (June 1978 supp.) § 28.2, pp. 299-300; 3A Wigmore, Evidence (Chadbourn rev. ed. 1970) §§ 907, 1005, pp. 694-697, 966-976.)

The rationale for permitting impeachment by contradiction is that by showing the falsity of a fact asserted by the expert, his entire testimony is brought into question. (Cf. Evid. Code, § 780; 3A Wigmore, Evidence, *supra*, §§ 907, 992, pp. 694-697, 926-928.)

Unlike a layperson, whose testimony must be based on personal knowledge (Evid. Code, § 702, subd. (a)), an expert may base his opinion on any matter made known to him at or before the hearing, provided only that the facts are of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject. (Evid. Code, § 801, subd. (b), see also Cal. Law Revision Com. com. to Evid. Code, §§ 801, 802, 29B West's Ann. Evid. Code (1966 ed.) pp. 389-391, 438-439.)

Under the rules of impeachment, a foundational fact underlying an expert's opinion is treated differently than the opinion itself. As explained by McCormick, "We use the word [opinion] as denoting a belief, inference, or conclusion without suggesting that it is well- or ill-founded." (McCormick, Evidence (2d ed. 1972) The Opinion Rule, § 11, p. 22.) For this reason, the law does not accord to the expert's opinion the same degree of credence or integrity as it does the data underlying the opinion. Like a house built on sand, the expert's opinion is no better than the facts on which it is based. Thus, we tell the jury it may disregard the expert's opinion, even if uncontradicted, and draw its own inferences from the facts. (Witkin, Cal. Evidence, *supra*, § 431, p. 388; *Kastner v. Los Angeles Metropolitan Transit Authority* (1965) 63 Cal.2d 52, 58 [45 Cal.Rptr. 129, 403 P.2d 385]; BAJI No. 2.40.) If the expert's opinion is contradicted by the opinion of another expert, it merely suggests the first expert may have reasoned incorrectly; it does not suggest his general untruthfulness as a witness.

On the other hand, where the *facts* underlying the expert's opinion are proved to be false or nonexistent, not only is the expert's opinion de-

stroyed but the falsity permeates his entire testimony; it tends to prove his untruthfulness as a witness.[9]

We recognize a court skates on thin ice when it attempts to distinguish between "fact" and "opinion." For example, Evidence Code section 600, subdivision (b) provides, "[a]n inference is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts found or otherwise established in the action." McCormick points out the difficulty in distinguishing between fact and opinion. (McCormick, Evidence, *supra*, § 11, pp. 22-26.) In a philosophical sense, all factual testimony by a witness, lay or expert, is opinion, i.e., the witness' belief as to what actually occurred.

Nevertheless, when it comes to impeaching expert witnesses, the distinction between an opinion and a foundational fact—though arbitrary—must be made. With the advent of the expert witness disclosure scheme of sections 2037-2037.6, the general rule that wide latitude is to be given to a party impeaching an expert witness must be abrogated insofar as it applies to impeachment under Evidence Code section 780, subdivision (i). If a liberal rule of interpretation were adopted to permit impeachment by contradiction of an expert's opinion, the legislative intent manifested in the expert witness disclosure statutes (i.e., reasonable notice to the opposing party of the expert's expected testimony) would be thwarted because everything constituting the basis of the ultimate opinion could be classified as a fact. In many cases, the ultimate opinion of the expert is based on a series of underlying opinions. Thus, rather than broadly construing what a foundational "fact" is, the term should be strictly construed by the trial court to prevent a party from offering a contrary opinion of his expert under the guise of impeachment.

In the present case, the photographs depicting the tire tracks and Mrs. Starner's testimony were the foundational facts upon which

---

[9]Witkin discusses a number of cases in relation to Evidence Code section 780, subdivision (i) (Witkin, Cal. Evidence, *supra*, § 1258, pp. 1161-1162; *id.* (1982 supp.) § 1258, pp. 715-716). In all of these cases, the nonexistence of the fact being contradicted created the inference that the witness may have been testifying falsely or his memory was faulty, thereby bringing into question the truthfulness of his entire testimony. For example, in *Moody* v. *Peirano* (1906) 4 Cal.App. 411, 416 [88 P. 380], the plaintiff sued for breach of warranty in the sale of seed wheat. The defendant testified he sold the same seed to two other individuals, Main and Myall, on the same conditions, without warranty. In rebuttal the plaintiff called Main, who testified that he bought seed from the same lot with a warranty. This was held to be proper contradiction on a relevant factual matter. Main's testimony tended to show that the defendant had lied or his memory was faulty.

O'Shea based his opinion that the tracks belonged to the VW. If appellant had sought to prove by expert testimony that the photographs were false, i.e., that they did not accurately depict the accident scene or that Mrs. Starner's testimony was inherently improbable, this would have been proper impeachment of O'Shea's opinions under Evidence Code section 780, subdivision (i).

A trial court should permit a party to call an unlisted expert to testify that a fact relied upon by the opponent's expert was incorrect or nonexistent. (See Carbone, *Impeachment by the Unlisted Expert* (Apr. 1982) CTLA Forum, pp. 75-76, suggesting that the coefficient of friction is a foundational fact to expert's opinion of speed.) Furthermore, the impeaching expert should be allowed to give his reasons why the opposing expert's foundational fact was false or nonexistent. An alert trial judge, however, will be quick to sustain an objection to any question going beyond the contradiction of the foundational fact and into the realm of general rebuttal of the opinion of the expert being impeached. (See *Ellenberger* v. *Karr, supra,* 127 Cal.App.3d at p. 427.) █ Since appellant did not offer his expert witnesses for the purpose of contradicting the foundational facts upon which O'Shea based his opinions, the trial court ruled correctly on the impeachment question.

### OTHER CONTENTIONS

We also reject counsel's disingenuous argument that appellant should have been permitted to call Mitchell to rebut the evidence of appellant's contributory negligence offered by respondent through O'Shea. First, the record reveals this argument was never made to the trial court; it cannot be asserted on appeal. Second, assuming the issue were cognizable on appeal, appellant would still be faced with the impeachment restriction of section 2037.5. Since appellant failed to disclose the substance of Mitchell's testimony before trial and knew exactly what O'Shea would testify to, any rebuttal of the defense evidence of contributory negligence was limited to impeachment, absent a showing of surprise by O'Shea's testimony which did not occur in this case. (See § 2037.5.)[10]

---

[10]Respondent also makes the illusory argument that O'Shea's testimony was offered not as proof of contributory negligence on appellant's part but merely to rebut appellant's proof of the proximate cause of the accident, i.e., the icy conditions of the roadway. O'Shea, however, testified appellant was not wearing her seatbelt and she "abruptly steered the VW across the centerline" based on his opinion that the tire tracks belonged to the VW. If appellant had disclosed Mitchell's opinion before trial as required by section 2037.3, she could have called Mitchell to express his opinion in re-

■ Finally we reject appellant's contention the trial court erred in precluding any expert witness from testifying on the ultimate issue of fact, i.e., whether the roadway at the site of the accident constituted a dangerous condition of public property. The basis of the trial court's ruling was that the jurors were fully capable of deciding whether the road constituted a dangerous condition based on their own experience; thus, there was no need for an expert to give his opinion on the ultimate question. (Evid. Code, § 801, subd. (a).)

"Under general principles of evidence law, ... the admissibility of expert evidence regarding the dangerous character of a property condition appears to be a discretionary matter for the trial court, to be evaluated in light of the facts of the particular case and the usefulness of the expert's opinions in arriving at the truth." (Van Alstyne, Cal. Government Tort Liability Practice (Cont.Ed.Bar 1980) § 3.83 7, p. 311.)

We cannot find the trial court abused its discretion in prohibiting the expert witnesses for both parties from expressing their opinions on the ultimate fact.

The judgment is affirmed.

Andreen, J., and Gomes, J.,* concurred.

---

buttal of O'Shea's contributory negligence opinions. Appellant correctly argues that she was not required in her case in chief to anticipate respondent's affirmative defense of contributory negligence. In actions against public entities based on dangerous conditions of public property, the burden of proving contributory negligence is on the defendant entity even though the plaintiff must prove that she was using the property with due care. (*Callahan* v. *City and County of San Francisco* (1967) 249 Cal.App.2d 696, 702 [57 Cal.Rptr. 639]; see also Cal. Tort Guide (Cont.Ed.Bar 1979) § 8.21, p. 129.)

*Assigned by the Chairperson of the Judicial Council.