Filed 3/22/16  Wright Graphics v. Owens CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| WRIGHT GRAPHICS, INC., et al., | B257411 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. PC053986) |
| v. | |
| LEON OWENS et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, William F. Fahey, Judge.  Affirmed.

Ezra Brutzkus Gubner, Brutzkus Gubner Rozansky Seror Weber, Larry W. Gabriel and Joseph M. Rothberg for Plaintiffs and Appellants.

Greenberg & Bass, James R. Felton and John R. Yates for Defendants and Respondents.

_____

Wright Graphics, Inc. (Wright Graphics) and its founder, Daniel Wright (Wright) (collectively, Plaintiffs) appeal from an amended judgment on a jury verdict, claiming that the trial court committed prejudicial error regarding (a) the admissibility of certain expert testimony and (b) the application of a set-off from the good faith settlement of a prior related action. We disagree with Plaintiffs and, accordingly, affirm the judgment.

## BACKGROUND

### I.      Wright Graphics

In approximately 1992, Wright and his wife founded Wright Graphics, a commercial printing company. Wright Graphics serviced the printing and mailing/delivery needs of a number of companies, including the Los Angeles Dodgers, J.D. Power and Associates, Honda, Starbucks, AT&T, and Verizon. Wright Graphics' "high watermark" with respect to sales was reached in 2007, when it earned approximately $17 million in sales.

After 2007, however, Wright Graphics entered a period of rapid decline. In 2008, sales dropped to $14.4 million. In 2009, sales were projected to be $2-3 million lower than in 2008. The company went from having approximately 200 employees in 2007 to only 85 by July 2009. By the beginning of October 2009, Wright Graphics was down to just 20-25 employees; two weeks later, the company's last remaining employees were laid off.

### II.      Wright Graphics and InterPrint

In 2008, Wright initiated discussions with InterPrint, L.L.C. (InterPrint), another printing company. Between April 2008 and July 2008, Wright had numerous discussions with InterPrint regarding the sale of Wright Graphics to InterPrint or a merger of the two companies. In June 2008, Wright agreed to sell his company to InterPrint and signed a nonbinding letter of intent. During the due diligence period, however, Wright decided not to go through with the sale and terminated the letter of intent.

In the latter half of October 2009, after exploring several other options, including bankruptcy, Wright renewed discussions with InterPrint. On or about October 27, 2009,

2

Wright signed a nonbinding letter of intent concerning the sale of Wright Graphics or its assets to InterPrint. Immediately thereafter, Wright, who was to be an equity partner in the new entity, "InterPrint-Wright," began working to transition his clients, such as J.D. Power, to InterPrint.

### III.    Wright Graphics and MARS

In early November 2009, Wright was advised by his principal secured creditors that Wright Graphics would have to enter into an assignment for the benefit of creditors (the ABC), if the creditors were going to support the merger with/sale to InterPrint. Wright was advised by his creditors that the assignee would be Leon Owens (Owens) of Management Advisory Resolution Services, Inc. (MARS) (collectively, Defendants). On November 4, 2009, pursuant to the ABC, Wright Graphics assigned its assets to MARS. On that same day, Owens as assignee, notified Wright Graphics' secured creditors that the assignment had taken place and agreed that InterPrint would license and continue to operate the Wright Graphics production facility.

Throughout November 2009 and into December 2009, Wright continued to help transition Wright Graphics' customers to InterPrint. Wright did so because, inter alia, he believed that the proposed merger/sale would be completed as planned—he was given business cards identifying him as a partner of InterPrint Wright and an email address for InterPrint Wright.

However, on or about December 15, 2009, Wright was advised that InterPrint was not going to go through with the proposed merger/sale. MARS then shut down and locked up Wright Graphics, turning its assets over to the company's secured creditors for sale at auction.

For their work as assignee, Owens and MARS were paid a total of $63,395.

### IV.    Wright Graphics sues InterPrint

On July 7, 2011, Wright, filed a verified complaint against InterPrint and certain related individuals and entities (but not Owens or MARS), alleging, inter alia, breach of fiduciary duty, fraudulent concealment, and interference with prospective economic advantage (the Wright-InterPrint Litigation).

On or about September 28, 2012, the parties to the Wright-InterPrint Litigation reached an agreement in principle to settle the matter. The parties subsequently reached an agreement on the precise terms of the settlement, which, inter alia, provided that the defendants would pay Wright $500,000; this payment, however, was contingent on a determination by the trial court that the settlement was entered into in good faith. On June 19, 2013, the trial court found that Owens and MARS were provided with an opportunity to be heard on issue of the proposed settlement's good faith and that the settlement was made in good faith within the meaning of sections 877 and 877.6 of the Code of Civil Procedure.[1]

## V. Wright Graphics sues MARS

On or about November 1, 2012, Plaintiffs filed suit against Defendants. In an unverified complaint, Plaintiffs alleged that the Defendants, as ABC assignees, had breached their fiduciary duty to Plaintiffs and that they had aided and abetted InterPrint in committing fraud and in intentionally interfering with Plaintiffs' prospective economic advantage.

Plaintiffs' claims against the Defendants were tried to a jury in February 2014. On February 18, 2014, after less than a day of deliberation, the jury returned a verdict in favor of Plaintiffs. The jury found that the MARS breached its fiduciary duty to Plaintiffs, that Owens was personally liable for MARS's breach, and that MARS's breach caused Wright $63,395.19 in damages plus attorney fees but did not cause any damage to Wright Graphics. The jury further found that while InterPrint defrauded Wright and interfered with his customer relationships, neither MARS nor Owens aided and abetted that misconduct. The jury also found that neither Wright Graphics nor Wright was damaged by InterPrint's fraud and Wright was not damaged by InterPrint's interference.

Following the verdict, Defendants moved to apply the $500,000 settlement payment from the Wright-InterPrint Litigation as a set-off against the $63,395.19

---

[1] All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

damages award, for entry of a "net zero" verdict in their favor, and a ruling that they, rather than Plaintiffs, were the prevailing parties for cost recovery purposes.[2]  On May 8, 2014, the trial court granted Defendants' motion, finding that because there was only "one injury" at issue in the two lawsuits an offset was appropriate, and on June 27, 2014, entered an amended judgment in favor of Defendants in the amount of their costs ($6,639.72).  On July 2, 2014, Plaintiffs timely appealed.

## DISCUSSION

### I.     The exclusion of expert testimony was not an abuse of discretion

Plaintiffs contend that the trial court erred with regard to two of its experts.  First, Plaintiffs argue that the testimony offered by their expert on ABC matters, Joel Weinberg (Weinberg), was improperly limited by the court's order precluding Weinberg from offering testimony about the customary standard of care for ABC assignees and from hearing Owens's courtroom testimony.  Second, Plaintiffs argue that the trial court erred by excluding any testimony by their expert on the commercial printing industry, Allen Tuchman (Tuchman).  We hold that the trial court did not abuse its discretion in either regard.

#### A.     *Standard of review*

We review rulings excluding or admitting expert testimony for abuse of discretion. (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773 (*Sargon*).)  "A ruling that constitutes an abuse of discretion has been described as one that is 'so irrational or arbitrary that no reasonable person could agree with it.'"  (*Ibid*.) A court's discretion, however, is "not unlimited"; it "must be exercised within the confines of the applicable legal principles."  (*Ibid*.)

---

[2] Under *Goodman v. Lozano* (2010) 47 Cal.4th 1327, because Plaintiffs did not obtain a "'net monetary recovery,'" they cannot be considered to be the "'prevailing party'" for purposes of recovering their costs pursuant to section 1032, even though the jury did find that the Defendants breached their fiduciary duty to Plaintiffs and thereby caused Wright to suffer $63,395.19 in damages.  (See *Goodman*, at pp. 1330, 1333–1338.)

B.      *The trial court did not abuse its discretion in limiting the testimony of Plaintiffs' ABC expert*

1.      TESTIMONY BY PLAINTIFFS' ABC EXPERT WAS PROPERLY LIMITED TO WHETHER DEFENDANTS' CONDUCT CONFORMED TO THE PREVIOUSLY AGREED UPON STANDARD OF CARE

While an expert may properly testify about a wide array of subjects, an expert "may not testify about issues of law or draw legal conclusions." (*Nevarrez v. San Marino Skilled Nursing & Wellness Centre, LLC* (2013) 221 Cal.App.4th 102, 122.)  On a related note, an expert may not offer opinions that are contrary to an established standard of care: "Allowing an expert to second-guess [a] profession results in the standard of care being established by the lay opinion of the jury; i.e., the jury substitutes its opinion of what the standard of care should have been for what the standard of care was as established by the . . . profession." (*N.N.V. v. American Assn. of Blood Banks* (1999) 75 Cal.App.4th 1358, 1385.)

Here, before trial, Plaintiffs proposed that the jury be instructed on the standard of care owed by Defendants to Plaintiffs by utilizing an appropriately modified version of CACI No. 4101.  The court accepted Plaintiffs' proposed jury instruction.

At trial, when Plaintiffs attempted to have Weinberg opine on the applicable standard of care for ABC assignees, Defendants objected, arguing that the proposed line of questioning was improper because it was asking for a legal opinion on a matter that the court had already ruled upon, namely, the applicable standard of care as reflected in the modified version of CACI No. 4101.  The court sustained the objection, noting that Plaintiffs had agreed to the modified CACI No. 4101 (which the court found to be a "correct statement" of the law) and explaining that "it's not proper for an expert to report to the jury what the law is.  That's the province of the court.  To the extent [Weinberg] believes there are duties beyond what the court is going to instruct, I don't think those are

6

relevant."[3]  The trial court then added that Weinberg may offer expert testimony "consistent" with CAC No. 4101—that is, "whether he believes there is some breach." The following day, Weinberg did exactly that, identifying a number of significant failures by Defendants to exercise reasonable business judgment and prudence, including the following:  permitting InterPrint to operate in Wright Graphics's facility without a firm purchase agreement; failing to perform a preference analysis; failing to obtain a nondisclosure agreement from InterPrint as to Wright Graphics's claimed proprietary information; and failing to obtain significant compensation from InterPrint for the benefit of the assignment estate.

In support of their argument that the trial court's decision to limit Weinberg's testimony was an abuse of discretion, Plaintiffs rely upon *Unigard Ins. Group v. O'Flaherty & Belgum* (1995) 38 Cal.App.4th 1229, for the proposition that "parties may introduce expert testimony on the standard of care."  Plaintiffs' reliance is misplaced.  As a preliminary matter, *Unigard* is easily distinguished from the instant case.  In *Unigard*, the plaintiffs were prevented from introducing "any" expert testimony on whether the defendant law firm had been negligent in its representation of a client.  (*Id*. at p. 1239.) Here, Plaintiffs were not so disadvantaged.  Moreover, as *Unigard* makes clear, the "'formulation of the standard of care is a question of law for the court,'" not a factual issue for the jury.  (*Id*. at p. 1237.)  "'Once the court has formulated the standard, its application to the facts of the case is a task for the trier of fact . . . .'"  (*Ibid*.)  The "crucial inquiry" in such a situation is whether the defendant's advice and actions were legally deficient.  (*Ibid*.)  Here, in contrast to *Unigard*, Plaintiffs were not only allowed to present some expert testimony but to do so on the central factual issue with regard to their fiduciary duty claim, namely whether Defendants failed to fulfill their duty to Plaintiffs.

---

[3] Before trial, the trial court had ruled that "Weinberg will not be permitted to give any legal opinions.  He may, however, give opinions so long as a sufficient foundation is laid . . . as to the duties of an assignee, and that will be pursuant to both the general assignment . . . and Probate Code Section 16040."

In short, because the trial court adopted Plaintiffs' definition of the applicable standard of care (the modified CACI No. 4101 jury instruction), there was no need for any expert testimony on that subject. All that was required to assist the jury on an issue outside of common experience—i.e., how a reasonably prudent ABC assignee would act compared with how Defendants actually performed—was expert testimony on the issue of breach, testimony which the trial court allowed, and, judging by the verdict, testimony that the jury found both credible and persuasive.[4] Accordingly, we hold that the trial court did not abuse its discretion with regard to limiting Weinberg's testimony to the issue of whether Defendants breached their duty to Plaintiffs.

2. THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN PRECLUDING PLAINTIFFS' ABC EXPERT FROM HEARING OWENS'S TRIAL TESTIMONY

After successfully moving to exclude all witnesses from the courtroom prior to their testimony, Plaintiffs asked the trial court to modify its order by allowing Weinberg to be present during Owens's testimony. The trial court denied the request, explaining, "That's not fair to the defense . . . because [Weinberg will] now be giving opinions other than the ones, at least potentially, that he gave at his deposition." The court based its decision on *Kennemur v. State of California* (1982) 133 Cal.App.3d 907 (*Kennemur*).

In *Kennemur*, *supra*, 133 Cal.App.3d 907, the plaintiff attempted to call an expert to testify about causation at trial. In three depositions prior to trial, however, the expert testified that he had no opinion to offer on causation. (*Id*. at pp. 912–913.) The trial court did not permit the expert to testify, and the Court of Appeal affirmed, holding: "When appropriate demand is made for exchange of expert witness lists, the party is required to disclose not only the name, address and qualifications of the witness but the

_____

[4] Plaintiffs argue that if Weinberg had been allowed to testify on the applicable standard of care they "could have received a better verdict" on their fiduciary duty claim. We are unpersuaded. Plaintiffs fail to identify any proposed testimony by Weinberg—no excerpts from a report prepared by Weinberg or any deposition testimony—that would have had some bearing on the issue of damages. Indeed, at trial, Weinberg admitted that he had never been tasked with analyzing this issue: "I haven't been asked to look at the dollar loss question."

8

*general substance* of the testimony the witness is expected to give at trial. [Citation.] In our view, this means the party must disclose either in his witness exchange list or at his expert's deposition, if the expert is asked, the substance of the facts and the opinions which the expert will testify to at trial." (*Id*. at p. 919.) The *Kennemur* court reasoned that "[o]nly by such a disclosure will the opposing party have reasonable notice of the specific areas of investigation by the expert, the opinions he has reached and the reasons supporting the opinions, to the end the opposing party can prepare for cross-examination and rebuttal of the expert's testimony." (*Ibid*.)

Plaintiffs contend that the trial court should have instead relied on *Easterby v. Clark* (2009) 171 Cal.App.4th 772, and allowed Weinberg to listen to Owens's testimony. If Weinberg's subsequent testimony at trial differed from his deposition testimony, then, Plaintiffs argue, Defendants could have explored the discrepancy during cross-examination, the discrepancy going to the weight, not the admissibility, of Weinberg's new opinions. Plaintiffs' argument is flawed because the facts in *Easterby* are very different than those here.

As a preliminary matter, *Easterby v. Clark*, *supra*, 171 Cal.App.4th 772, is not about an expert being allowed to hear the trial testimony of percipient witnesses before he or she testifies. Rather, *Easterby* is concerned with the extraordinary circumstances that lead a trial court to permit an expert to testify beyond his deposition by offering new opinions at trial. Moreover, the determining issue in *Easterby* was notice—something that Plaintiffs ignore in their discussion of the case. In *Easterby*, the court held that it was prejudicial error to exclude an expert's causation testimony at trial even though he offered no such causation opinions during his deposition. The *Easterby* court did so because the defendants had notice of the new opinion—three months notice—and an opportunity to depose the expert again before trial to explore it, but they failed to take advantage of that opportunity. (*Id*. at p. 780.) Here, Defendants would have had no notice, let alone fair notice, of Weinberg's new opinions nor would they have had an opportunity to depose him before his new opinions were presented to the jury. In reaching its decision, the court in *Easterby* stressed the fundamental importance of

9

fairness in trial preparation and, in so doing, put itself squarely in line with *Kennemur*, *supra*, 133 Cal.App.3d 907: "The overarching principle in *Kennemur* [and other cases] is clear: a party's expert may not offer testimony at trial that exceeds the scope of his deposition testimony *if* the opposing party has no notice or expectation that the expert will offer the new testimony, or *if* notice of the new testimony comes at a time when deposing the expert is unreasonably difficult." (*Easterby*, at p. 780.) Both of *Easterby*'s prohibitive conditions applied to Plaintiffs' request.

We hold that the trial court, under the facts of this case, did not abuse its discretion in excluding Weinberg from hearing Owens's trial testimony. Such a decision was consistent with both the trial court's prior ruling—made at Plaintiffs' request—that all witnesses be excluded from courtroom prior to their testimony on the stand and with the holding and reasoning of *Kennemur*, *supra*, 133 Cal.App.3d 907, and *Easterby*, *supra*, 171 Cal.App.4th 772. Because it would have been "grossly unfair and prejudicial" to allow Weinberg to listen to Owens's trial testimony[5] and then offer additional opinions at trial based on that testimony (*Jones v. Moore* (2000) 80 Cal.App.4th 557, 564–565), the trial court, under the circumstances of the instant case, acted properly in denying Plaintiffs' request.[6]

---

[5] We acknowledge that had Owens's trial testimony differed markedly from the testimony he gave at his deposition, the trial court may have felt compelled to take a number of steps to insure a fair trial, including possibly allowing Weinberg to offer new opinions at trial. However, it does not appear from the record before us that Owens's trial testimony varied meaningfully from his deposition testimony and even if it did, Plaintiffs failed to identify any such variance on appeal.

[6] We further acknowledge that under other circumstances not discussed herein, a trial court might decide that the best course of action is to permit each expert to remain in the courtroom so as to hear the testimony of both percipient witness and/or other experts. We note this to avoid implying or suggesting that there is only one way to address this question regarding expert testimony.

10

C.	*The trial court did not abuse its discretion in excluding the testimony of Plaintiffs' commercial printing expert*

"A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates." (Evid. Code, § 720, subd. (a).) "'The trial court is given considerable latitude in determining the qualifications of an expert and its ruling will not be disturbed on appeal unless a manifest abuse of discretion is shown.'" (*People v. Cooper* (1991) 53 Cal.3d 771, 813.)

Under Evidence Code section 801, the trial court acts as a "gatekeeper to exclude speculative or irrelevant expert opinion." (*Sargon*, *supra*, 55 Cal.4th at p. 770.) As our Supreme Court explained in *Sargon*, "'[T]he expert's opinion may not be based "on assumptions of fact without evidentiary support [citation], or on speculative or conjectural factors . . . . [¶] Exclusion of expert opinions that rest on guess, surmise or conjecture [citation] is an inherent corollary to the foundational predicate for admission of the expert testimony: will the testimony assist the trier of fact to evaluate the issues it must decide?"'" (*Ibid*.) "This means that a court may inquire into, not only the type of material on which an expert relies, but also whether that material actually supports the expert's reasoning. 'A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.'" (*Id*. at p. 771.)

Before trial, the trial court excluded, in its entirety, the proposed testimony of Tuchman, Plaintiffs' expert on the commercial printing industry, who was to offer opinions relating to how Defendants caused Plaintiffs' alleged damages.[7] The court did so for two principal reasons: First, Tuchman's proposed testimony was not sufficiently beyond common experience to be helpful to the jury: "Sales reps, I think it's well-

---

[7] Tuchman was not Plaintiffs' only damages expert or even its principal damages expert. Plaintiffs' lead expert on damages was John Kimble Dietrich, a professor of finance from the Marshall School of Business at the University of Southern California. Professor Dietrich opined on Wright's loss of earnings due to InterPrint's interference with his customer relationships ($2.1 million) and the value of Wright Graphics when it entered into the ABC (between $1.1 million and $3 million).

known, certainly to this court, if not to the—most commonsensical juror, do scramble for business and they do compete with other sales reps and they do take runs at other sales reps' clients and sometimes they are successful and sometimes they're not. But for this witness to be asked to somehow quantify or give an opinion on how often that occurs or what are the factors as to which drives that change of a client is just wholly beyond what I think this witness is qualified to testify about. [¶] . . . [¶] There's nothing beyond the common experience of a group of adult jurors with respect to commissions and the fact that clients who have a long-term relationship with a particular individual, salesman or otherwise, will stay with them and sometimes they're poached by other sales reps. Nothing at all difficult about that."

Second, even if Tuchman's testimony would potentially be of some general assistance to the jury, it lacked an adequate foundation with respect to the key issues of causation and damages. Specifically, the court found that Tuchman "has only passing knowledge of this case and the factual scenario in this case. He knows of only three, maybe four, five of Mr. Wright's customers. He has no idea what the payment structure is, the commission structure. He has no knowledge of the negotiations with InterPrint. No knowledge of the financial—extraordinary financial difficulties that Wright was having during 2009. Tuchman has no knowledge whatsoever about the assignment with Owens. His testimony is highly speculative as to any loss of revenues or customers."

Plaintiffs argue that the exclusion of Tuchman was an abuse of discretion and for support rely on *Howard Entertainment, Inc. v. Kudrow* (2012) 208 Cal.App.4th 1102 (*Kudrow*). In *Kudrow*, a personal manager sued an actress for breach of contract following his termination, alleging that he was owed a percentage of her income earned from engagements that she entered into while he was her manager. (*Id*. at p. 1105.) When the actress moved for summary judgment, the plaintiff argued that it was the custom and practice in the entertainment industry to pay posttermination commissions; the plaintiff supported his opposition with the declaration by an expert who had worked in the entertainment industry for 35 years "as an executive in business affairs, talent agent, and personal manager. He has obtained employment for actors, directors, writers,

and producers. He was president of a prominent talent agency. He has discussed extensively entertainment matters with persons in the entertainment business. He represented as a talent agent actors who were represented by personal managers. He was familiar with specific instances concerning the payment of personal managers after termination of their representation. He discussed the matter with attorneys at a prominent entertainment law firm"; moreover, he "personally was a party to agreements like the one" at issue in *Kudrow*. (*Id*. at p. 1116.) The trial court sustained the actress's objections to the declaration due to a lack of foundation and granted her summary judgment. (*Id*. at pp. 1111–1112.) The Court of Appeal reversed, holding that there was adequate foundation as to the expert's qualifications and the facts upon which he relied. (*Id*. at pp. 1121–1122.)

Plaintiffs reliance on *Kudrow*, *supra*, 208 Cal.App.4th 1102, is unavailing. While Plaintiffs are correct that "[e]xpert testimony is admissible to prove custom and usage in an industry," it is also correct, as the court in *Kudrow* acknowledged, that "such testimony is subject to foundational challenges." (*Id*. at p. 1114.) In *Kudrow*, the expert's qualifications and experience served as an adequate foundation for his opinions, because he was only tasked with showing that in an "emerging profession" there is a custom and practice to pay posttermination compensation to personal managers, just as there is "an established custom and usage to pay posttermination compensation to talent agents." (*Id*. at p. 1120.) Here, in contrast, Tuchman was being asked to do something more ambitious than simply establish that there is often a special bond between sales representatives, such as Wright, and their clients. Instead, Tuchman was tasked to also show that Wright could not reclaim his customers once he had been improperly induced to transition them to InterPrint and, therefore, he suffered damages as a result of Defendants having allegedly aided and abetted InterPrint. Tuchman, however, as the trial court properly noted, did not have the requisite knowledge to support such an opinion. To borrow from *Sargon*, *supra*, 55 Cal.4th at page 771, there was "'simply too great an analytical gap'" between Tuchman's knowledge and his proffered testimony on causation and damages.

Because the trial court's exclusion of Tuchman's testimony was not irrational or arbitrary, but reasoned and reasonable, we affirm.

## II.     The offset was appropriate

Plaintiffs argue that the trial court improperly applied the $500,000 settlement from the Wright-InterPrint Litigation to the judgment in the instant case. Plaintiffs claim the set-off was improper because the claims in Wright-InterPrint Litigation "were unrelated to the tort for which damages were awarded" in the instant action. Plaintiffs' argument is based on the text of section 877, which limits set-offs for good faith settlements to "tortfeasors claimed to be liable for the *same* tort" (italics added). Plaintiffs' argument is without merit.

As our Supreme Court stated in *Mesler v. Bragg Management Co.* (1985) 39 Cal.3d 290, "the language of section 877 is significant—its drafters did not use the narrow term 'joint tortfeasors,' they used the broad term 'tortfeasors claimed to be liable for the same tort.' This language was meant to eliminate the distinction between joint tortfeasors and concurrent or successive tortfeasors [citation], and to permit broad application of the statute." (*Id*. at p. 302.) Section 877 has been construed to apply "'even more generally to "all tortfeasors joined in a single action" whose acts or omissions "concurred to produce the sum total of the injuries to the plaintiff."'" (*Gackstetter v. Frawley* (2006) 135 Cal.App.4th 1257, 1272.)

*Kohn v. Superior Court* (1983) 142 Cal.App.3d 323 (*Kohn*), is illustrative on how broadly section 877 is to be applied. In that case, the purchasers of a residence filed suit against a number of parties, including the seller and certain contractors, each of whom had performed work or services on the property before the completion of the sale. The purchasers alleged that the sellers had misrepresented the condition of the property and had breached their fiduciary duties to disclose that the property had been damaged in a fire. They also alleged that one contractor had negligently performed repairs on the property and a structural pest control company had negligently performed an inspection thereon. In addition, the purchasers alleged that all defendants had conspired to conceal the fire damage and had committed fraud. The purchasers entered into a settlement

14

agreement with the repair contractor and the structural pest control company before trial. Those settling defendants then obtained a good faith settlement determination and a dismissal of the sellers' cross-complaint. (*Id*. at pp. 325–326.) The sellers filed a writ petition to challenge the good faith settlement determination and the dismissal of their cross-complaint. (*Id*. at p. 325.) They argued that section 877 was inapplicable because they and the settling defendants were not "'claimed to be liable for the same tort,'" within the meaning of the statute. They explained that they were being sued, in essence, for fraud, whereas the settling defendants were being sued for the failure to properly repair or inspect the property. (*Id*. at p. 328.) The court in *Kohn* rejected that argument, holding that "there was but one injury, [the] purchase of a house which was worth less than plaintiffs believed. [Citation.] The alleged tortious activities by the contractor, pest control inspector and seller were not independent, but combined to create one indivisible injury which took place when the sale was consummated." (*Id*. at p. 329.)

Here, as in *Kohn*, *supra*, 142 Cal.App.3d 323, although there were different sets of defendants, there was just one indivisible injury. The injury described in Plaintiffs' pleadings in both actions was the same—the loss of Plaintiffs' business assets, namely their clients and the confidential information related thereto (e.g., customer lists, account files, trade secrets, etc.). Not only did Plaintiffs' pleadings allege one indivisible injury, but the complaints even alleged a unitary mechanism for that injury—both sets of defendants were alleged to have breached their fiduciary duties to Plaintiffs and they either committed fraud and intentional interference with Plaintiffs' prospective economic advantage or aided and abetted that misconduct.

In sum, because the defendants in both actions were "claimed to be liable for the same tort" (§ 877), the set-off was properly applied by the trial court to the jury's verdict against Defendants.[8]

---

[8] Plaintiffs also argue that it was inappropriate for the trial court, not the jury, to apply the set-off. According to Plaintiffs, the case should be remanded "to allow the jury to determine a set-off is appropriate pursuant to a determination of whether there was a good faith settlement." This argument too is without merit. First, the trial court, in

15

**DISPOSITION**

The judgment is affirmed.  The parties shall bear their own costs on appeal.

NOT TO BE PUBLISHED.


JOHNSON, J.


We concur:


ROTHSCHILD, P. J.


CHANEY, J.

---

accordance with the procedures discussed in section 877.6, already determined that there was a good faith settlement of the Wright-InterPrint Litigation.  In fact, the motion for a good faith determination was a joint motion brought by InterPrint defendants *and* Wright.  So there was nothing for the jury to decide with regard to "whether there was a good faith settlement."  Moreover, that joint motion, which was filed after Plaintiffs had already sued Defendants, expressly stated that Wright wanted the good faith determination because he "intends to pursue claims against other alleged *joint tortfeasors*."  Second, although section 877 does not specify how a nonsettling defendant shall raise the claim of an offset, it is well recognized that it is entirely proper for a nonsettling defendant to defer assertion of the right to offset until after the completion of the trial—that is, until after his/her liability has been established.  (*Knox v. Los Angeles* (1980) 109 Cal.App.3d 825, 834.)  As the court in *Knox* explained, "especially in jury cases, the defendant should not be required to prejudice its defense by disclosing substantial settlements made by codefendants.  [¶] . . . [¶]  [T]here is ample precedent for deferring the offset issue until after the determination of the merits."  (*Ibid.*)