Filed 10/28/15  Samarkos v. Goddard CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| ANDREA SAMARKOS, | D066284 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2009-00063736-CU-PA-CTL) |
| THOMAS E. GODDARD, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of San Diego County, Judith F. Hayes, Judge.  Judgment reversed; appeal from postjudgment order dismissed.

The Simon Law Group, Robert T. Simon; Niddrie, Fish & Addams, Michael H. Fish and John S. Addams for Plaintiff and Appellant.

Michael Maguire & Associates, Paul Kevin Wood; Law Office of Cherie A. Enge and Cherie A. Enge for Defendant and Respondent.

Plaintiff Andrea Samarkos sued Thomas E. Goddard for damages for personal injuries she allegedly sustained when Goddard drove his vehicle into the rear end of her

vehicle, which she had stopped at a red light.  Samarkos appeals from a judgment entered on a jury verdict in which the jury awarded Samarkos damages in the amount of $15,000 — $5,000 for past medical expenses and $10,000 for past noneconomic loss, but $0 for future medical expenses and future noneconomic loss.

Samarkos contends that the judgment should be reversed and a new trial ordered on the following grounds:  (1) during trial, the court erred in allowing two defense medical experts to offer opinions at trial that they did not disclose at their depositions; (2) during trial, the court erred in sustaining evidentiary objections to a written report and certain testimony from Samarkos's life care planning expert regarding future expenses from and related to Samarkos's anticipated medical procedures; and (3) during deliberations, in response to a question from the jury, the court erred in refusing to reinstruct the jury that it could request that the court reporter read back testimony from the life care planner.

We conclude that the trial court prejudicially erred in allowing into evidence the opinion testimony of one of the experts and, accordingly, reverse the judgment.  In addition, we dismiss Samarkos's appeal from the order denying a judgment notwithstanding the verdict.

## I.

## PROCEDURAL BACKGROUND[1]

Samarkos filed the underlying action against Goddard in January 2009. The case went to trial in early 2011, and the jury returned a verdict awarding Samarkos $53,118 in economic loss, $116,000 for pain and suffering and $55,000 in punitive damages. (*Samarkos I*, *supra*.) Goddard appealed, and we reversed the judgment. (*Ibid.*)

The case was tried again in April 2014. As relevant to the determinative issue on appeal, during trial the court denied Samarkos's motions to strike certain opinion testimony from one of Goddard's medical experts on the basis he offered an opinion that he did not disclose at his deposition. The jury returned the following verdict: Goddard's negligence was a substantial factor in causing harm to Samarkos;[2] for damages, Samarkos was entitled to $5,000 for past medical expenses, $10,000 for past noneconomical loss (including pain and suffering), $0 for future medical expenses and $0

---

[1] On our own motion, we take judicial notice of our prior unpublished opinion in this matter, *Samarkos v. Goddard*, D060052 (June 14, 2013) (*Samarkos I*). (*Epic Communications, Inc. v. Richwave Technology* (2015) 237 Cal.App.4th 1342, 1347, fn. 3.)

[2] On the first day of trial, prior to motions in limine, Goddard's attorney advised the court that Goddard "admitted negligence," but not liability. Counsel did not advise the court what she meant by "Goddard's negligence." On appeal, Samarkos's attorney tells us that "Goddard admitted liability," but cites us to the exchange at which Goddard's attorney admitted Goddard's "negligence," not "liability." Neither in the trial court nor on appeal has either party provided an explanation of what Goddard admitted. Given the remainder of the verdict form in which the jury was asked to determine causation and damages, we assume that Goddard stipulated that he breached the duty of due care he owed Samarkos.

for future noneconomical loss (including pain and suffering); and Goddard did not, by clear and convincing evidence, act with malice.[3]

Disappointed with the jury's finding that precluded punitive damages, Samarkos filed a motion for judgment notwithstanding the verdict (JNOV), in which she sought an order that Goddard acted with malice. Disappointed with the $0 awarded for future damages, Samarkos filed a motion for a new trial, which she amended to include a request for additur. Goddard opposed both motions. Samarkos filed replies to both oppositions. The court entertained oral argument, took the motions under submission and issued a minute order denying both of them.

During the pendency of the posttrial motions, the court filed a judgment consistent with the verdict, which required Goddard to pay Samarkos $15,000, with costs to be determined at a later date.

Samarkos timely appealed from both the judgment and the order denying the motion for JNOV.[4]

---

[3]     The record on appeal does not include the verdict form. The judgment, which purports to set forth the verdict does not contain an answer to the question whether Goddard acted with malice. The clerk's minutes indicate the jury responded "Yes" to the question whether Goddard acted with malice. The reporter's transcript indicates the jury responded "No" to the question whether Goddard acted with malice. In her posttrial motion, Samarkos asked the court to set aside the finding in favor of Goddard as to malice. Neither party mentions punitive damages in the briefing on appeal. Considering everything that is before us, we will harmonize this conflict in the record in favor of the reporter's transcript. (See *Arlena M. v. Superior Court* (2004) 121 Cal.App.4th 566, 570; *People v. Anzalone* (2013) 56 Cal.4th 545, 552, fn. 6 [absent other indications of an inaccurate transcript, "we presume the court reporter accurately reported the proceedings"].)

## FACTUAL BACKGROUND

In January 2007, 41-year-old Samarkos was stopped at a stoplight with her foot on the brake of her Mercedes 320 CLK, when Goddard, who was driving a Ford Explorer, hit Samarkos's rear bumper. Samarkos "fl[ew] forward," and then "flew back" with her head hitting the headrest, feeling "a burst or a pop" in her back. A piece of one of her bonded teeth broke off. Samarkos's vehicle sustained $10,840.43 in damage.

Goddard, who was intoxicated at the time,[5] described the accident as "just a bump." Goddard's passenger felt Goddard apply the brakes "and then bump[] into her." Goddard's airbags did not deploy, and neither Goddard nor his passenger suffered any injury. As a result of the collision, Goddard's front bumper "moved . . . about one inch," but there were no scratches (let alone dents) on Goddard's car, including the front bumper.

Immediately after the accident, while Samarkos was waiting for the paramedics she had called, she felt pain in her shoulder, neck and back — which by then she knew was hurt. The ambulance took Samarkos to a hospital emergency room, where the

---

[4]  Because Samarkos raises no issue or argument regarding the order denying the motion for JNOV, we deem the appeal from it to be abandoned and dismiss the appeal from this order. (*Bell v. Bayerische Motoren Werke Aktiengesellschaft* (2010) 181 Cal.App.4th 1108, 1131.)

[5]  At the time of collision, Goddard's blood alcohol level was between .28 and .32. Goddard tells us he was convicted of misdemeanor driving under the influence without causing injury.

medical staff examined and released her with a prescription for pain medication; no X-rays were taken.

Samarkos, who did not have any back problems before the collision, has been in pain since the impact. Describing the "stabbing, searing pain" as "a constant 24/7 ache" that "never goes away," Samarkos testified that the location of the pain was "below my waist, right-hand side, down a few inches, . . . radiat[ing] out to both hips, and then . . . go[ing] up and down to my waist, and then . . . end[ing] right at my buttocks." At times, she also experiences a numbness in her fingers.

As a result of her back pain, Samarkos's lifestyle changed. Prior to the accident, Samarkos regularly exercised, attended sporting events, travelled and socialized with family and friends. Since the accident, Samarkos has been unable to exercise (and has gained 90 pounds), no longer goes out to restaurants, travels occasionally (but is unable to partake in the activities at the destinations the way she had in the past) and otherwise limits her activities to work. Daily routines — sleeping, waking, bathing, dressing, eating, cleaning, et cetera — are difficult and painful. Samarkos's ability to work efficiently and effectively has been adversely affected.

## III.

## DISCUSSION

The principal issues at trial were causation and damages: did the collision cause Samarkos's back pain, and if so what was the extent of Samarkos's injuries and related damages caused by the collision? At trial the parties presented evidence related to the cause and severity of Samarkos's injuries: Samarkos contended that, in the accident, she

6

suffered a significant spinal injury, including an annular tear and herniation, that required future surgeries, and Goddard contended that Samarkos suffered at most a soft tissue injury for which she was treated and from which she had recovered. On appeal, Samarkos contends that, as a result of certain erroneous trial court rulings, she was prejudiced as evidenced by an award of only $15,000 in past damages and $0 in future damages.

Since the collision in January 2007, Samarkos has consulted with and been treated by more than 10 physicians and other healthcare professionals and has had at least five magnetic resonance imaging tests (MRI's). Interpreting the results of the various MRI's was hotly contested at trial. At trial, the jury was presented with evidence related to the MRI's taken on the following dates: April 2007 (the first MRI taken after the accident); July 2007 (ordered in part because Samarkos experienced acute back pain); December 2008 (ordered because Samarkos experienced an episode "beyond pain," "absolutely excruciating pain"); January 2011 (shortly before the trial in *Samarkos I*); and January 2014 (shortly before the trial underlying this appeal).

Samarkos's expert opined that, as a result of the accident, Samarkos had a herniated disc at the L5-S1 level for which Samarkos would need two surgeries on her spine. In contrast, Goddard's experts opined that Samarkos suffered no acute spinal injury as a result of the collision — rather, any problems associated with a disc were the results of typical degenerative changes in the spine and a late 2008 incident resulting in an acute herniation — which allowed Goddard's counsel to argue that Goddard was not responsible for any surgeries. Accordingly, the parties' experts' opinions regarding the

7

MRI's were of utmost importance. At issue on appeal is whether the trial court erred in allowing two of Goddard's experts to express an opinion based on a January 2014 MRI that neither expert had reviewed at the time of his deposition just weeks before the trial. As we explain *post*, we agree that the court erred in denying Samarkos's motion to strike the expert testimony from Goddard's neurosurgeon (Richard Ostrup, M.D.) and that this error was not harmless.

Samarkos also contends that the trial court erred in sustaining Goddard's objections to the admissibility of Samarkos's life care plan expert's written report and certain opinions. Finally, Samarkos argues that she is entitled to a new trial based on the court's denial of her request to reinstruct the jury that it could ask that testimony be read back. Because we will reverse based on the erroneous admission of one the experts' opinion testimony, we need not reach the other issues.

A.      *Summary of Testimony Based on MRI's*

As relevant to the issue on appeal, the jury heard expert testimony regarding the interpretation of the MRI's from three different witnesses: Fardad Mobin, M.D., Samarkos's expert neurosurgeon;[6] Richard Ostrup, M.D., Goddard's expert neurosurgeon;[7] and Stephen Rothman, M.D., Goddard's expert neuroradiologist.[8]

---

[6]      According to Mobin, a neurosurgeon is "trained to deal with problems of the brain and spine and the peripheral nerves," including "disc herniations," and has subspecialty training in surgery.

[7]      According to Ostrup, neurosurgery involves "surgical treatment of the nervous system," which includes the brain, spine (discs, fractures, infections, tumors) and peripheral nerves (carpal tunnels, ulnar nerves, reconstruction of nerves to the spine).

The jury also heard opinion testimony regarding the MRI's from Brian J. Killeen, D.C., Goddard's expert chiropractor.[9] However, Samarkos moved to strike this testimony, and the trial court gave a curative instruction that Killeen "is not an expert in radiology" and "is not qualified to testify as to the results of radiographic studies." We presume that, absent a contrary showing, the jury followed the instructions given (*People v. Harris* (2013) 57 Cal.4th 804, 857), and thus did not consider Killeen's opinions regarding the MRI's; therefore, we will not include these opinions in our discussion.

1.      *April 2007 MRI*

Mobin had not seen and thus did not offer an opinion based on the April 2007 MRI.

Ostrup testified in part that the April 2007 MRI "did not show any acute problems. There's no fracture. There's no discs [bulging]. You see some degenerative changes, but everybody gets degenerative changes . . . . As we age, our discs will shrink. They can bulge back. But we all get degenerative disc disease. . . . [¶] But there's nothing on the April 2007 MRI that showed any acute problem. And that's three months after this accident. So within reasonable medical probability, had [Samarkos] had a significant problem, we would have seen it on that initial MRI."

---

8      According to Rothman, a neuroradiologist "is a physician who has special training and expertise in looking at the different types of picture studies of the spine and brain."

9      According to Killeen, a chiropractor "is a nontraditional type of practitioner who basically works on the spine with manipulation and various physical therapy modalities." Killeen also has a degree in acupuncture and traditional Chinese medicine, which allows him to "cover the gamut as far as physical therapy is concerned."

Rothman agreed that, because Samarkos's April 2007 MRI was taken the closest in time to the accident, it is "[t]he most important one"; and he testified that "there's no evidence of anatomic injury on that MRI scan." However, the April 2007 MRI showed "two dark dehydrated discs" below "three relatively normal discs," and Rothman explained, "[d]ark means decreased water, drying out, which is the most important manifestation of aging or degeneration of the spine." Describing the two dehydrated discs as "typical degenerative discs," Rothman opined that "[i]t takes roughly two to two and a half years to darken a disc," concluding that the April 2007 MRI did not show any evidence of a recent traumatic injury. Rothman explained that all degenerative discs have fissures — commonly referred to as "annular tears" — which show up on the MRI as a white spot around an enclosed annulus[10] on a degenerative disc (which shows up black on the MRI). According to Rothman, when there is an annular tear, part of the nucleus material from the disc seeps out of the shell of the annulus, irritating the neural tissue. This irritation is abrasive, creating inflammation which causes pain. Samarkos's April 2007 MRI showed an annular tear.

---

[10]    Mobin explained that the "annulus" is "the covering of the back of the disc."

### 2. *July 2007 MRI*

Showing the jury an image of Samarkos's L5 and L4 vertebrae and their disc from the July 2007 MRI, Mobin explained that what the jury was seeing "is that part of this [disc] is bulging out. It's actually herniated."[11]

Ostrup testified that Samarkos's July 2007 MRI " 'shows an annular tear . . . at L4-[L]5.' "

Rothman's review of the July 2007 MRI was consistent with his review of the April 2007 MRI: some of the discs were healthy (white), two of the discs were degenerating (dark) with a bulge at L5-S1, and there was an annular bulge.[12] Describing the MRI as showing that Samarkos had "mild degenerative disc disease and broad-based disc bulge," Rothman confirmed that this type of condition "is never caused by recent trauma."

### 3. *December 2008 MRI*

In early December 2008, Samarkos experienced "excruciating pain," which she described as "beyond pain" in discovery responses. Her physician ordered an MRI.

---

[11]   Rothman contrasted the difference between a bulge and a herniation of a disc. With a bulge, "the back of the disc is symmetrically smooth." With a herniation, liquid is forced out of a small opening in the disc — which Rothman compared to jelly being forced out of the hole in a jelly donut. In both cases, the disc protrudes or sticks out.

[12]   Rothman testified that the disc was bulging more than in the April 2007 MRI, but he was unable to determine whether this was a result of further degeneration or of Samarkos being placed in different positions in the two MRI's.

The parties do not direct us to any opinions from Mobin regarding the December 2008 MRI.

Based on the December 2008 MRI, Ostrup testified that Samarkos suffered a herniated disc at L5-S1; it was "a pretty good size disc." Nonetheless, Ostrup confirmed his earlier opinion that the January 2007 collision did not cause Samarkos's back problems — "either directly or indirectly": "There's two years of living in there and an MRI [from April 2007] that wasn't impressive three months after the accident. And it's just not temporally reasonable." Notably, based on the December 2008 MRI, the annular tear at L4-L5 that Ostrup mentioned in his review of the July 2007 MRI was no longer there; it had healed. Thus, Ostrup continued, "it's highly unlikely" that Samarkos's back pain could be attributed to the L4-L5 annular tear.

Rothman explained that the December 2008 MRI was "very, very dramatically different" from the prior two. In addition to the healthy (white) and degenerative (black) discs, Rothman described a "huge thing sitting out here inside the spinal canal" — "a huge recent soft tissue disc herniation" that "has all of the imaging characteristics of a recent acute sudden disc herniation" that occurred within the prior four months. This recent herniation, according to Rothman, "almost surely" caused Samarkos's December 2008 pain.

4.    *January 2011 MRI*

Mobin testified that the January 2011 MRI showed that "the L5-S1 disc is pushed out even more [than in the July 2007 MRI], and it's directed out to the level of the nerve root."

12

According to Ostrup, the "pretty good size disc" at L5-S1 that he described from the December 2008 MRI "was there to a smaller degree" on the January 2011 MRI.

Rothman testified that the two upper discs (white) were "still normal," the third and fourth discs had "darkened" (degenerated) a bit, but that the disc between the fifth vertebra and the sacrum "has changed once again dramatically over the last two years." According to Rothman, the herniation that was present in the December 2008 MRI "has shriveled. We still see part of it present, but it's much smaller now than it was before. It "shrunk"; "the water has gone, the disc has dried and shriveled, and that's going to stay like that."

5.     *January 2014 MRI*[13]

According to Mobin, the January 2014 MRI film showed "the same problem" as in the January 2011 MRI: the disc at L5-S1 is "pushed out into the canal . . . within close proximity of the S1 nerve root," which affected the specific areas of pain and numbness of which Samarkos complained. He considered this an "ongoing injury at the L5-S1 level" that started on the day of the collision in January 2007.

---

[13]     Following the January 2014 MRI, the parties received copies of both a film of the imaging and a one and a half page written report based on the imaging. The report, signed by a radiologist, was provided by the company that took the MRI and listed the sequencing technique, Samarkos's clinical history, six findings and three conclusions. The testimony at trial was based on the *film*, whereas (as we will discuss *post*) at Ostrup's deposition, the testimony was based on the *written report*.

Ostrup's review of the January 2014 MRI film resulted in his testimony that the herniated disc that had been causing Samarkos's pain was "no longer there"; "the disc is gone"; "[t]he disc went away"; it had been "absorbed":

> "[T]hat disc is no longer there on the study that was done in January 2014. So the disc was — was absorbed. So that's not the source of her pain. . . .

> "But the disc, I don't think, is likely to be the problem because it's no longer there. . . . What you have over a seven-year course of imaging studies is a progression of some degenerative changes, but we see those quite frequently in people that don't have any back pain as well."

> "[T]here's nothing on the MRI, in my opinion, that would explain her back pain. The disc is not an issue. It's no longer there. . . . So that didn't cause [Sammarkos's] pain."

> "I don't believe [the pain Samarkos complained about as of February 2014 is related to the January 2007 automobile accident]. She says she has back pain. I just don't have any objective findings that I can correlate as a cause of her back pain."

> "[*I*]*f you believe that the accident caused the L5-S1 disc and you thought that was a source of her back pain, then you would have to say, well, why does she still have the back pain if the disc is gone?*" (Italics added.)

On cross-examination, Ostrup confirmed that, *based on his review of the January 2014 MRI film*, "[t]here's no doubt" that the previously herniated disc was "reabsorbed."

According to Rothman, the January 2014 MRI film indicated that the L5-S1 disc is "narrowed" and "protruding" just "as before" — with "manifestations of the further degeneration of the disc in the interim between '14 and '11."

B.    *Ostrup's Deposition Testimony*

In preparation for trial, Samarkos's attorney took Ostrup's deposition seven days before the first witness testified at trial. At that time, Ostrup had not seen the January

14

2014 MRI film. Ostrup knew about the 2014 MRI procedure because he had seen the radiologist's one and a half page written report, which provides in relevant part:

"1.     There is disk desiccation at L3-L4 level. . . .

"2.     There is disk desiccation at L4-L5 level.

"3.     There is a 2mm broad-based posterior endplate osteophyte formation at L5-S1 level making contact with the anterior aspect of the thecal sac."

At the deposition, Samarkos's counsel did not ask whether — and thus Ostrup did not offer an opinion that — based on the written report, the L5-S1 disc was still there or had been absorbed.

At trial, Ostrup confirmed that, *at his deposition, he testified that he "reviewed all the records and gave all [his] opinions*." (Italics added.) Significantly, the records Ostrup reviewed did not include the January 2014 MRI film, and the opinions Ostrup gave did not include that Samarkos's L5-S1 disc had been absorbed and was no longer there.

C.     *Trial Court's Rulings*

At trial, Samarkos's attorney timely objected to Ostrup's opinions based on his postdeposition review of the January 2014 MRI film — orally moving to strike the testimony at the time it was offered, and filing a written motion the next day. The court denied both requests.

In denying the oral motion, the court ruled that Ostrup's trial testimony was consistent with his deposition testimony; "[t]he only thing that's changed is he's seen the [January 2014 MRI] film." In denying the written motion (after the close of evidence,

15

but before instructing the jury), the court confirmed the earlier ruling, emphasizing that Samarkos's attorney did not tie down Ostrup at deposition in two regards: (1) counsel did not ask Ostrup to notify him if Ostrup reviewed additional materials; and (2) counsel knew that Ostrup had reviewed the *written report* based on the January 2014 MRI, yet did not ask questions regarding disc herniation.[14]

On appeal, Samarkos argues that the trial court prejudicially erred in denying her motions to strike Ostrup's expert opinions — based on Ostrup's postdeposition review of the January 2014 MRI film — that the L5-S1 disc was no longer there and had been absorbed and that Samarkos did not need future surgery.

D.    *Legal Analysis*

1.      *Standard of Review*

We review the trial court's admission of expert testimony for an "abuse of discretion, looking to whether the court's ruling 'exceeded the bounds of reason.' " (*Piscitelli v. Friedenberg* (2001) 87 Cal.App.4th 953, 972; accord, *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773.)

---

[14]    The record on appeal indicates that the trial court had read Ostrup's deposition transcript before ruling on the written motion. All that is before us in the record on appeal, however, are three pages from the deposition transcript in the appellant's appendix and an occasional quotation from the deposition transcript in the reporter's transcript from the trial. All that we may consider from Ostrup's deposition testimony is that which is contained in the record on appeal. (*Truong v. Nguyen* (2007) 156 Cal.App.4th 865, 882 [items not part of the record on appeal "cannot be considered"].)

16

However, even the erroneous admission of expert opinion evidence does not require a reversal without a showing of prejudice (Code Civ. Proc., § 475) that resulted in a "miscarriage of justice" (Cal. Const., art. VI, § 13; Evid. Code, § 353, subd. (b)). (*Pool v. City of Oakland* (1986) 42 Cal.3d 1051, 1069 (*Pool*).) For purposes of this analysis, a "miscarriage of justice" may be found on appeal " ' "only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." ' " (*Ibid*; accord, Code Civ. Proc., § 475; *San Diego Gas & Electric Co. v. Schmidt* (2014) 228 Cal.App.4th 1280, 1301-1302.) In this context, "reasonably probable" "does not mean more likely than not, but merely a *reasonable chance*, more than an *abstract possibility*." (*College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715 (*College Hospital*).) Prejudice is not presumed (Code Civ. Proc., § 475), and the appellant bears the burden of establishing that the erroneous admission of evidence was prejudicial (*People ex rel. City of Santa Monica v. Gabriel* (2010) 186 Cal.App.4th 882, 887).

2. *The Trial Court Erred in Denying Samarkos's Motions to Strike Ostrup's Opinions Based on His Postdeposition Review of the January 2014 MRI Film*

The issue of whether an expert's trial testimony may diverge from his deposition testimony has been explored in a number of opinions.

In *Kennemur v. State of California* (1982) 133 Cal.App.3d 907 (*Kennemur*), the plaintiffs in an automobile personal injury action called an expert at trial to offer an opinion regarding accident reconstruction relating to the highway conditions. (*Id*. at

17

pp. 911-912.) However, in three pretrial depositions, the expert had limited his testimony to the condition of the vehicle as a cause of the accident. (*Id.* at pp. 912-913.) The trial court precluded the expert testimony; and the Court of Appeal affirmed, ruling in relevant part that under the procedures for pretrial discovery of experts, "the party must disclose . . . at his expert's deposition, if the expert is asked, the substance of the facts and the opinions which the expert will testify to at trial. Only by such a disclosure will the opposing party have reasonable notice of the specific areas of investigation by the expert, the opinions he has reached and the reasons supporting the opinions, to the end the opposing party can prepare for cross-examination and rebuttal of the expert's testimony." (*Id.* at p. 919.) In light of the express limitations the expert placed on his opinions at deposition, the court held defendant "was entitled to rely on [the expert's] disclaimer until such time as [the plaintiff] disclosed that [the expert] had conducted a further investigation and had reached additional opinions in a new area of inquiry." (*Id.* at p. 920.)

The court reached a similar conclusion in *Jones v. Moore* (2000) 80 Cal.App.4th 557 (*Jones*). There, the plaintiff sued her former attorney for legal malpractice after her exhusband stopped paying spousal support. (*Id.* at pp. 560-561.) At his deposition, the plaintiff's expert was asked to state "everything" he believed the defendant did that fell below the standard of care. (*Id.* at p. 563.) The expert responded by identifying four areas related to the negotiation of the underlying divorce settlement and judgment. (*Ibid.*) The expert disclaimed any other opinions regarding the defendant's conduct in other areas of his representation. (*Ibid.*) When asked if he anticipated doing further work

18

to arrive at any other opinions, the expert replied, " 'No, but if I do, you will be notified well in advance, so as to be able to properly exercise your discovery rights.' " (*Ibid.*) At trial, the plaintiff sought to elicit testimony from her expert concerning the defendant's failure to properly secure the source of the plaintiff's spousal support income — a task unrelated to his negotiation of the underlying settlement and judgment. (*Id.* at p. 564.) The trial court sustained the defendant's objection that the plaintiff's question called for an opinion beyond the scope of the expert's deposition testimony, and the Court of Appeal affirmed. (*Ibid.*)

As in *Kennemur*, the court in *Jones* held the defendant was entitled to rely on the expert's express representation that he had disclosed all opinions he would offer at trial, as well as the expert's promise to notify the defendant if he formulated any new opinions. (*Jones*, *supra*, 80 Cal.App.4th at pp. 565-566.) The expert "was in effect not made available for deposition as to the further opinions he offered at trial . . . . He promised to notify defendant if he later formulated such opinions but did not do so." (*Id.* at p. 565; see Code Civ. Proc., § 2034.300, subd. (d) ["the trial court shall exclude from evidence the expert opinion of any witness that is offered by any party who has unreasonably failed to . . . [m]ake that expert available for a deposition"].) "Under these circumstances, exclusion of testimony going beyond the opinions he expressed during his deposition was justified. . . . When an expert deponent testifies as to specific opinions and affirmatively states those are the only opinions he intends to offer at trial, it would be grossly unfair and prejudicial to permit the expert to offer additional opinions at trial." (*Id.* at pp. 564-565, citation omitted.)

19

In *Bonds v. Roy* (1999) 20 Cal.4th 140, a medical malpractice case, the defendant's expert "specifically confirmed" at his deposition that "he did not expect 'to be giving any testimony or any opinion concerning the standard of care issues that might be involved in this case.' "[15]  (*Id.* at p. 143.)  The Supreme Court affirmed the Court of Appeal's affirmance of the trial court's order denying defense counsel's request on the last day of trial to expand the scope of the expert's testimony to include the applicable standard of care.  (*Id.* at pp. 143, 149.)  Citing the facts (1) that the defendant's expert was the last defense witness, testifying on the last day of testimony, which precluded the plaintiff from taking his deposition, and (2) that the defendant made no attempt to expand the expert's testimony until just prior to his taking the stand, the court explained:  "This late request afforded no practical opportunity for [the expert] to be deposed or for [plaintiff's] own experts to rebut [the expert's] testimony."  (*Id.* at p. 149.)

In *Easterby v. Clark* (2009) 171 Cal.App.4th 772 (*Easterby*), the court distilled the following "overarching principle" from *Kennemur*, *Jones*, and *Bonds*:  "a party's expert may not offer testimony at trial that exceeds the scope of his deposition testimony *if* the

---

[15]    The holding in *Bonds* is not based on the fact that the expert confirmed *at his deposition* that he had no further opinions.  Rather, *Bonds* is concerned with the defendant's failure to have included standard of care in the defendant's statutory *expert witness declaration* under Code of Civil Procedure former section 2034, subdivision (f)(2)(B) — which required that the defendant disclose "the general substance of the testimony that the expert is expected to give." (*Bonds*, *supra*, 20 Cal.4th at pp. 144, 149, italics omitted.)  (That requirement is now found at Code Civ. Proc., § 2034.260, subd. (c)(2).)  Nonetheless, because the expert's testimony at his deposition (that he had no additional opinions) was similar to Ostrup's here, we find the court's discussion instructive.

opposing party has no notice or expectation that the expert will offer the new testimony, or *if* notice of the new testimony comes at a time when deposing the expert is unreasonably difficult." (*Easterby*, at p. 780.)  Applying this principle to the facts of the present case, we conclude that the trial court abused its discretion in allowing Ostrup to offer his previously undisclosed opinion — based on his review of the January 2014 MRI film *after* his deposition — that Samarkos's L5-S1 disc had been absorbed and was no longer there.

At his deposition, Ostrup affirmed (1) that he had expressed all the opinions he intended to offer at trial, and (2) that he would inform Samarkos's counsel if, prior to trial, he reviews anything new that changes his opinions.  As *Kennemur* and *Jones* instruct, Samarkos's attorney was entitled to rely on Ostrup's assurances; Goddard's counsel (or Ostrup) had the obligation to disclose to Samarkos's attorney that Ostrup had reviewed the January 2014 MRI film and reached additional opinions.  (*Kennemur*, *supra*, 133 Cal.App.3d at p. 920; *Jones*, *supra*, 80 Cal.App.4th at pp. 565-566.)  No such disclosure was made.  Instead, as in *Bonds*, Goddard's counsel made no effort to advise Samarkos's counsel of the new opinion.  Thus, the first indication to Samarkos's counsel that Ostrup had a new opinion (or had even reviewed the January 2014 MRI film) was *during Ostrup's direct testimony at trial* — on the day before the close of evidence — at a time that afforded "no practical opportunity" for a further deposition or for Samarkos's

21

expert to rebut this testimony.[16] (*Bonds*, *supra*, 20 Cal.4th at p. 149.) Under these circumstances, the trial court abused its discretion in allowing into evidence — i.e., in not striking — Ostrup's previously undisclosed opinions based on his review of the January 2014 MRI film during the week between his deposition and his trial testimony. (Cf. *Bonds*, at p. 149; *Jones*, at pp. 564-565.)

We disagree with Goddard's contention that Ostrup's testimony did not include a new opinion. According to Goddard, Ostrup's trial testimony was "consistent[]" with his opinion "that the initial MRI of the lumbar spine in April 2007 showed no acute changes and no evidence of traumatic injury." However, the opinion that the April 2007 MRI showed no acute changes and no evidence of traumatic injury is not the same opinion as: even if the accident caused a disc herniation at the L5-S1 level, the January 2014 MRI shows that Samarkos's L5-S1 disc had been absorbed or was no longer there. Such a contention ignores Ostrup's own testimony concerning his opinions *after 2007* regarding Samarkos and her L5-S1 disc: "She had a pretty good size disc in December of '08," and "it was there to a smaller degree in January of 2011."[17] Such a contention also ignores

_____

16    In support of the written motion to strike, Samarkos's attorney expressly objected on the ground that, had he known of Ostrup's new opinions based on Ostrup's postdeposition review of the January 2014 MRI film, he would have retained a neuroradiologist to counter them.

17    Goddard tells us that, at Ostrup's deposition, Ostrup "described what he saw in the [2011] film, and by omission, did not testify that he saw any findings of a herniated disc in the 2011 film." We have disregarded this statement for at least two reasons: Goddard provides no record reference for the statement (*McOwen v. Grossman* (2007) 153 Cal.App.4th 937, 947; Cal. Rules of Court, rule 8.204(a)(1)(C)); and the statement is inconsistent with Ostrup's trial testimony quoted in the text.

22

the very next sentence in Goddard's brief, in which Goddard criticizes Samarkos's counsel for not asking Ostrup at his deposition "to explain what happened to *the herniated disc that was clearly seen in the 2008 MRI scan*" (italics added) — an acknowledgement by Goddard that Ostrup was aware of the herniated disk in the December 2008 MRI.

Goddard further argues that the trial court did not abuse its discretion, because Samarkos's attorney did not ask Ostrup at his deposition "to compare the 2011 and 2014 MRI's, even though Dr. Ostrup [only] had the radiology report of the latter MRI study at the time of his deposition."  In a related argument Goddard suggests that because Ostrup did not offer deposition testimony to the effect that the January 2014 MRI *written report* contained evidence of a herniated disc, his trial testimony (that the January 2014 MRI *film* did not contain evidence of a herniated disc) did not contradict his deposition testimony.  These arguments ignore the fact that at the time of his deposition Ostrup had not seen the January 2014 MRI film, and Ostrup's trial testimony is quite clear:  his opinions that the disc had been absorbed and was no longer there were *based on his review of the January 2014 MRI film* (which he had not seen at the time of his deposition), *not on the radiologist's written report*.[18]

18    Indeed, at trial immediately after Ostrup testified that he knew "from the films" that "the pretty good size disc in December of '08 . . . was not there in January 2014," Samarkos's counsel read from Ostrup's deposition, asked Ostrup to confirm his deposition testimony and moved to strike Ostrup's new opinions based on the January 2014 MRI under *Kennemur*.

Finally, parroting the trial court's analysis, Goddard criticizes Samarkos's counsel for not asking Ostrup at his deposition "if the 2014 [written] report revealed a herniated disc or whether the herniated disc condition evident in the 2008 MRI had changed." However, there is no indication that the written report, which Ostrup had at the time of his deposition, contains any information regarding the absorption or disappearance of the L5-S1 disc. The report refers to a "posterior endplate osteophyte formation making contact with the anterior aspect of the thecal sac." The court interpreted that language to mean that "this shows no abnormality other than an osteophyte, which is, as you know, bone. [¶] . . . [¶] This is not saying that there's a herniation." In response, counsel relied on the evidence at trial that was contrary: when the osteophyte "pokes out," counsel explained, "it's wrapped *around the herniation*."[19] (Italics added.) Not having seen the 2014 MRI film at the time of his deposition, of course, Ostrup could not have offered an opinion as to the accuracy of the radiologist's written report.

In conclusion, Ostrup did not offer an opinion at his deposition that, based on the written report (or on anything else), the disc was no longer there. At his deposition,

---

[19]    In so doing, counsel also reminded the court that his explanation was consistent with the trial testimony of both Rothman (Goddard's expert) and Mobin (Samarkos's expert). In describing the 2014 MRI, Rothman had testified: "The disc is protruding as before. But now, as the disc continues to degenerate, there's this little whispy whiteness in the bone, and that's the typical response of bone to the degenerative process in the disc. . . . [T]hese are just manifestations of the further degeneration of the disc in the interim between '14 and '11." In describing the 2014 MRI, Mobin had testified: "[W]e still see the same problem [as before]. It's the disc that's pushed out into the canal. . . . [N]ow the bone is reacting. We see this white halo . . . within the bone itself at the L5 vertebra, and we see changes within the end plate of — of her sacrum."

24

Ostrup answered "Yes" to the question whether he "had gone over all the opinions" he would offer at trial. Yet, at trial, Ostrup offered the opinion — for the first time by anyone — that in 2014 the disc had been absorbed and was no longer there. Under such circumstances, the trial court erred in allowing Ostrup to offer a new opinion based on his postdeposition review of the January 2014 MRI film.[20]

3. *The Trial Court's Error Resulted in Prejudice to Samarkos*

Samarkos has met her burden of establishing a miscarriage of justice as a result of the trial court's error in allowing Ostrup's testimony based on his postdeposition review of the January 2014 MRI film.

Initially, we note that, as a result of the timing of the disclosure of Ostrup's new opinions based on his review of the January 2014 MRI film — namely, at the end of the defense case — Samarkos suffered the "lack [of] a fair opportunity to prepare for

---

[20]  The concept that an expert cannot offer an opinion based on work performed after the expert's deposition was not unknown to Goddard's attorney. Without any indication that Samarkos's experts may have formed opinions after their depositions, Goddard's attorney filed a motion in limine "[t]o exclude from the trial the opinions of all of [Samarkos's] experts[] formed **after** their deposition[s] or based on work performed following their respective depositions."

Neither at trial nor on appeal has Goddard's counsel suggested any reason for not advising Samarkos's counsel that, after the conclusion of Ostrup's deposition just a week before the trial, Ostrup reviewed additional materials and formed additional opinions. We agree with the *Easterby* court's reliance on the following advice to attorneys:  " 'when your expert has been deposed and disavowed having any additional opinions, and you later discover that he or she can offer additional helpful opinions, *write opposing counsel immediately.*  Offer to have the expert redeposed . . . .' " (*Easterby*, *supra*, 171 Cal.App.4th at p. 781.)

25

cross-examination or rebuttal." (*Bonds*, *supra*, 20 Cal.4th at p. 147.) Even stronger evidence of prejudice to Samarkos, however, is found in the jury's verdict.

At trial, defense expert Rothman testified that, as of the first MRI taken a few months after the accident, there was no indication of any disc problems caused by a trauma or any evidence of a traumatic injury to Samarkos's spine.[21] At trial, defense expert Ostrup agreed that any disc problems Samarkos suffered were the result of some "degenerative changes," opining that they were neither caused nor exacerbated by the accident. Acknowledging that the automobile accident may have caused Samarkos "a soft tissue injury," Ostrup reaffirmed his opinion that there was "[no] injury to the vertebral column." Significantly, however, Ostrup supplemented the defense opinion (no injury to the spine) by testifying that, *even if* the accident caused the L5-S1 disc herniation and *even if* that herniation was the source of Samarkos's back pain, "why does she still have the back pain *if the disc is gone*?" (Italics added.)

In the context of this defense evidence, *by a vote of 12-0*, the jury found that Goddard "caus[ed] harm" to Samarkos.[22] The only issue at that point was the *extent* of the harm to Samarkos, who had testified to continuous pain and suffering from the day of

---

[21]    Rothman testified that Samarkos's two lower discs appeared dehydrated, which is typical of a degenerative disc and takes two to two and a half years to manifest.

[22]    Having reviewed all of Samarkos's MRI's, as well as his personal examination of Samarkos, Mobin (Samarkos's expert) testified "to a reasonable degree of medical probability" that the January 2007 collision with Goddard "is the main event that . . . set off and caused the disc damage which, in turn, has produced Ms. Samarkos'[s] back pain."

the accident through trial. In the context of this evidence, the jury awarded Samarkos $15,000 for *past losses*; but *by a vote of 9-3*, the jury found that the harm did not extend to *future losses* — either medical expenses or noneconomic damages.

*Both* defense experts, Rothman and Ostrup, testified that, as of December 2008 and January 2011, Samarkos suffered a herniated disc at L5-S1.[23] Further, as of January 2014, according to Rothman, Samarkos's L5-S1 disc was still "protruding" just "as before" with "manifestations of the further degeneration" since 2011.[24] Given this evidence and Samarkos's testimony of continuous pain and suffering, the award of $0 for future losses is questionable — *except for* (1) Ostrup's testimony that, *even if* the jury believed that the accident caused Samarkos's disc herniation and back pain, "why does she still have the back pain *if the disc is gone*?" (italics added); and (2) Goddard's counsel's closing argument that, according to Ostrup, fusion surgery "would have been appropriate" in 2008 when "[t]his herniated disc . . . was there," but now in 2014 there is no need for surgery, because "the disc has reabsorbed. It's not there."

Given the unanimity of the finding on causation, an award of damages for past losses, the testimony from the other two experts (Rothman and Mobin) that as of January 2014 the L5-S1 disc was herniated, and the nine-to-three finding that Samarkos was not

---

[23] Mobin did not express an opinion based on Samarkos's health in December 2008. He testified that, as of 2011, Samarkos's L5-S1 disc was "pushed out" and "directed out to the level of the nerve root."

[24] Mobin testified that the January 2014 MRI showed "the same problem" as in the January 2011 MRI, which he described as an "ongoing injury at the L5-S1 level" that started on the day of the collision in January 2007.

27

entitled to damages for future losses, there is "a *reasonable chance*, more than an *abstract possibility*" (*College Hospital*, *supra*, 8 Cal.4th at p. 715) that one (or more) of the nine jurors who voted against an award of damages for future losses did so in reliance on Ostrup's testimony that *even if* the accident caused a disc injury, the disc was no longer there — evidence that the trial court erroneously admitted since it was based on Ostrup's review of the January 2014 MRI film.  Had just one juror not voted for a $0 award for future damages, of course, Samarkos would have received a more favorable result.

In conclusion, Samarkos was prejudiced by the erroneous admission of Ostrup's new opinions based on his postdeposition review of the January 2014 MRI film.  After examining the entire record, we believe that there is "a *reasonable chance*, more than an *abstract possibility*" (*College Hospital*, *supra*, 8 Cal.4th at p. 715) " ' "that a result more favorable to [Samarkos] would have been reached in the absence of the error" ' " (*Pool*, *supra*, 42 Cal.3d at p. 1069).

## DISPOSITION

The judgment is reversed.  The appeal from the order denying Samarkos's motion for judgment notwithstanding the verdict is dismissed.


IRION, J.

WE CONCUR:


BENKE, Acting P. J.


McINTYRE, J.