Filed 9/30/24  Albrecht v. Regents of the University of California CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| PETER ALBRECHT, | |
| Plaintiff and Respondent, | G062170 |
| v. | (Super. Ct. No. 30-2013-00685473) |
| REGENTS OF THE UNIVERSITY OF CALIFORNIA, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Randell Wilkinson, Retired Judge. (Retired judge of the Orange Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.) Affirmed.

Horvitz & Levy, H. Thomas Watson and Dean A. Bochner; Quarles & Brady, Sandra L. McDonough and Joanne A. Buser for Defendant and Appellant.

Bohm Law Group, Lawrance A. Bohm, Kelsey K. Ciarimboli and Zane E. Hilton for Plaintiff and Respondent.

\*          \*          \*

Years after plaintiff was dismissed from his psychiatric nursing job at University of California, Irvine Medical Center (UCI), a jury awarded him roughly $2.2 million in damages after finding he was unlawfully discriminated against based on age or disability, as well as retaliated against for use of legally protected leave. Defendant Regents of the University of California appeals, arguing the trial court committed prejudicial evidentiary and instructional errors which require remanding the case for a new trial.

On the record before us, we find no reversible error. Defendant's evidentiary objection to alleged expert opinion testimony below failed to have the requisite specificity to preserve the issue now raised for appeal, and its argument would nevertheless fail on the merits. Also, irrespective of the validity of defendant's claimed instructional error, a matter on which we express no opinion, defendant fails to demonstrate prejudice. Thus, we affirm the judgment.

## FACTS

### I.

### CASE INITIATION, EARLY PROCEEDINGS, AND FIRST TRIAL

This case has its genesis in the 2013 termination of plaintiff from his employment at UCI, which UCI claimed was a result of excessive unexcused absences, and the events leading up to it. After his termination, plaintiff filed suit against defendant for purported violations of the Family

and Medical Leave Act (29 U.S.C. § 2601 et seq.; FMLA), the California Family Rights Act of (Gov. Code, § 12945.1 et seq.; CFRA), the California Fair Employment and Housing Act (Gov. Code; § 12900 et. seq.; FEHA), and various other state laws. Among other allegations, he claimed age and disability discrimination, harassment, failure to prevent harassment, and retaliation for use of FMLA/CFRA leave.[1]

Defendant moved for summary judgment, or in the alternative, summary adjudication. The trial court denied the former but granted the latter as to eight of 11 causes of action. Left remaining for trial were three FEHA based claims—harassment, failure to prevent harassment and failure to engage in the interactive process.

At trial, defendant prevailed on the three remaining claims. Specifically, the court granted defendant's motion for nonsuit on the failure to engage in the interactive process cause of action, and the jury unanimously found for defendant on the harassment related claims. The court entered judgment which incorporated the matters determined at trial and at the summary adjudication phase.

Plaintiff appealed. In an unpublished opinion, another panel of this court affirmed the judgment in part, and reversed it in part. (*Albrecht v. Regents of the University of California* (Aug. 23, 2018, G054003) [nonpub. opn.].) The aspects reversed concerned certain claims summarily adjudicated in defendant's favor: age and disability discrimination under FEHA; and retaliation under FMLA/CFRA. The opinion explained there were disputed

---

[1] For simplicity, we often refer to FMLA and CFRA qualifying leave throughout this opinion as FMLA leave.

issues of fact material to those causes of action that needed to be resolved by a jury.

## II.

### SECOND TRIAL

Following remand, the parties moved forward with a second jury trial which was limited to the discrimination and retaliation claims. Both sides offered a variety of witnesses, including experts, and plaintiff testified on his own behalf. We summarize testimony elicited, with a focus on matters relevant to the issues raised by defendant in this appeal.

UCI hired plaintiff as a psychiatric nurse in 2000. Roughly seven years later, a patient attacked plaintiff while he was working, leaving plaintiff with serious injuries. Among the lasting impacts that persisted were lower back problems.

In 2010, plaintiff returned to full-time work at UCI. His workers' compensation physician, orthopedic surgeon Dr. Mitchell Geiger, provided work restrictions of "[n]o lifting, pushing, [or] pulling more than 50 pounds." After about a year and a half of working night shifts in the inpatient adolescent unit, plaintiff applied to transition to day shifts in the Adolescent Partial Hospitalization Program, a program focused on preventing adolescent psychiatric hospitalization and transitioning hospitalized adolescents with psychiatric issues back into their homes (the partial program).

The then director of UCI's neuropsychiatry center, Paula Martin, chose plaintiff from among the candidates to be a clinical nurse for the partial program. At the time, in March 2012, plaintiff was 63, Martin was 60, and the assistant director, Teresa Briano, was in her late fifties or early sixties. Plaintiff testified Martin was aware he had a disability when she brought him into the program.

4

In early April 2012, within days of plaintiff's start with the partial program, UCI notified plaintiff of what it considered "substandard attendance" due to two March 2012 absences from work. The written warning stated plaintiff should "immediately" contact Briano should he believe the absences qualified as exclusions under FMLA, and notified him of a right to request review of the warning. There was evidence UCI provided the same type of written warning to plaintiff three times over the course of the prior seven years for other absences, although one of the prior warnings did not mention FMLA leave.

After receiving the written warning, plaintiff emailed a supervisor to whom he had spoken on the day of one of the two March 2012 absences. The supervisor indicated plaintiff called her on the day in question to say he was not coming in for his shift and to request a sick day because "he had been summon[ed] to court." Plaintiff's email told the supervisor that he failed to mention that his "wife was having a histerical [*sic*] breakdown . . . to the point of vomiting," so he requested a "[f]amily [s]ick [d]ay," not a personal sick day, to allow him to take her to an attorney's office because she could not driver herself. A human resources representative, Dale Cole, who reviewed the email communications decided UCI would not recharacterize the absence and the discipline would stand: "We are going to follow his original report, which was that he was required to deal with a summons. Since he was not sick, he is not eligible to access his sick pay. And, since we are not approving family illness leave, he cannot access his sick pay." Cole also noted the existence of the one other March absence of which plaintiff made no mention.

Plaintiff received a similar written warning in July 2012 which identified one absence from work on July 2, 2012. Plaintiff testified he told Briano that the absence was due to a flare-up of his back condition. He

5

provided two explanations for the cause of the flare-up—house work to test the impact on his back prior to a periodic check in with Dr. Geiger and stress caused by an altercation with his wife.

One month later, in mid-August 2012, plaintiff obtained certification from Dr. Geiger that he had a chronic serious health condition, and associated flare-ups, which necessitated intermittent FMLA leave. Martin approved plaintiff's request for such intermittent leave at that time, and she approved the recertification of it in January 2013. The intermittent FMLA benefits allowed plaintiff up to 12 weeks, or 480 hours, of annual coverage.

Over the next few weeks, plaintiff used FMLA leave twice. On the first occasion, he emailed Briano to let her know he needed a couple of FMLA days off. The second time, on Labor Day, plaintiff notified Briano and Martin he needed to take FMLA leave the following day because he had an accident a couple of days earlier and had to talk to Dr. Geiger before coming into work.

At trial, plaintiff testified that Martin became less congenial toward him after she approved his FMLA leave certification in August 2012. He explained there was a "total change in her behavior," with her sending "letters and things of that nature which were unfounded" and getting "angry with [him] in memos."

In February 2013, after a few more instances of plaintiff taking FMLA leave days, Martin sent a letter to plaintiff about his intermittent FMLA leave. In addition to listing his absences during the prior year, which included at least seven FMLA leave days, Martin conveyed the following: "A review of your absences from last year, shows that your episodic flare-ups were in conjunction with a holiday on 3 occasions (4th of July, Labor Day, and

6

New Year). . . . [¶] I am bringing this to your attention because I can determine no reason why episodes or flare-ups will most likely occur around holiday time off in the future. If you believe this is not the case, please ask you [*sic*] physician to update the information provided to indicate that flare-ups are more likely to occur on or around the holiday and we will attempt to accommodate that."

Roughly one month later, in a letter dated March 25, 2013, Martin notified plaintiff he was "immediately being placed on a paid administrative leave and it [was her] intent to dismiss [him] from . . . employment effective April 4, 2013" due to his "continuing substandard attendance." After listing the three written absence warnings provided between February and July 2012, Martin noted plaintiff left early from work on one day in October 2012 and had been absent from work one day in February 2013 and four consecutive days in mid-March 2013. In addition, she stated that plaintiff had "been late arriving to work on every scheduled shift for the past three (3) payperiods, a total of 21 late arrivals within the past six weeks."

Plaintiff testified that Briano was at the meeting during which Martin gave him the letter notifying him of the intent to terminate. After describing the meeting as cold, distant, abrupt, and unexpected, plaintiff conveyed that at the end of the meeting Martin said to him, "You need to retire anyhow. . . . Look, you can hardly walk." Briano testified she could not recall much about the meeting. Martin testified plaintiff was "unsteady on his feet" and "grimaced" when he got up to leave the meeting, so she asked if he was okay and if he was in pain. She denied telling plaintiff that he looked disabled.

7

Plaintiff, through a labor union representative, requested review and reconsideration of the contemplated termination decision. UCI held a pretermination *Skelly*[2] hearing on April 4, 2013. Cole, who advised Martin that termination was appropriate and assisted her in providing notice of such an intent, was the presiding officer at the hearing. Martin was also present.

At the *Skelly* hearing, plaintiff explained the reason for each of the absences identified in the intent to terminate notice. Regarding February 15, 2013, he conveyed he had the flu which impacted his lower gastrointestinal system in such a way that he spent many hours in the bathroom. As a result, he experienced a lot of pain, sciatica problems, and spasm, all related to his back condition. Concerning March 5 through 8 of the same year,[3] plaintiff explained he had bronchitis which caused him to cough a lot, and the coughing impacted his back "extremely." And as for October 13, 2012, he said he left work early because he injured his back while playing ball with some of the partial program kids.

Plaintiff and his union representative also explained the parking related reason for the identified tardiness to work. He previously would use a UCI provided golf cart service to take him from the parking structure to his work building because walking that distance would lead to back spasms. However, UCI "stopped [him] from using that service," forcing him to wait for a handicap parking spot closer to the hospital to become free. Those spots would only open after the work shifts prior to his would end, causing him to be late.

---

[2] *Skelly v. State Personnel Board* (1975) 15 Cal.3d 194 (*Skelly*).

[3] Martin's letter incorrectly identified these dates as March 12 through 15.

A few days after the *Skelly* hearing, on April 8, 2013, Cole emailed plaintiff's union representative to "make the University's position clear on a few issues." Among UCI's positions were the following: (1) although UCI "ha[d] not been able to validate [plaintiff's] justification of his tardiness . . . , [UCI would] momentarily set those occurrences aside"; (2) plaintiff's FMLA explanations for absences were not mentioned at the time of the absences; and (3) there was "no reason to remove any of the occurrences from [plaintiff's] disciplinary record." Based on those determinations, UCI "believe[d] that a decision to dismiss [plaintiff was] supported by progressive discipline and [UCI] work rules for attendance." Notwithstanding UCI's formal conclusion, Cole "propose[d] a resolution to return [plaintiff] to work."

Over the course of the next few weeks, plaintiff's union representative communicated with Cole to negotiate an alternative path forward. In turn, Cole was in communication with the University of California's Office of the President.

Before it could be determined whether there would be an impasse or a negotiated alternative resolution, Martin provided plaintiff with a letter of dismissal. It read, in part: "I have given careful consideration to your statements and to those made by your [union] representative during the Skelly Hearing on April 4, 2013. However, I have found no basis on which to rescind this decision and you are hereby dismissed from your employment with UCI Medical Center effective May 10, 2013."

At trial, Cole explained that after about one month of working on negotiated terms, "it had been made clear to [him] . . . that [he] was not going to get an answer [from the university side] any time in the near future." And, because a critical position to the organization was sitting vacant, Cole "made

9

a decision . . . that [UCI] could no longer take additional time [to negotiate] when there was no clear decision coming in the immediate future."

Plaintiff unsuccessfully contested his termination in an administrative grievance process provided for by a collective bargaining agreement. The grievance denial came in a letter from Martin which conveyed, inter alia, that UCI found all absence occurrences listed in the notice of intent to dismiss "were accurately counted in accordance with [the UCI attendance policy]" and that plaintiff's "use of sick leave was not reasonable."

## III.

### SECOND TRIAL JURY VERDICT AND POSTTRIAL MOTIONS

The jury rendered a nine-to-two verdict in plaintiff's favor on the claims submitted to it—discrimination under FEHA and retaliation in violation of FMLA/CFRA.[4] A special verdict form memorialized the jury's findings as to various issues, including whether plaintiff's physical condition or age was a substantial motivating reason for UCI's decision to terminate him, whether his use of FMLA medical leave was a substantial motivating reason for such action, whether UCI's absence policy was also a substantial motivating reason for his dismissal, and whether plaintiff failed to reasonably mitigate his economic damages. The jury answered the former two questions affirmatively, and the latter two negatively.

Total damages awarded to plaintiff by the jury equaled $2,166,000. The award consisted of $495,000 in past economic loss, $521,000 in future economic loss, $650,000 in past noneconomic damages (e.g.

---

[4] Due to medical and other issues which arose during trial, the parties stipulated to complete the trial with an 11-member jury.

emotional distress), and $500,000 in future noneconomic damages. Following the trial court's award to plaintiff of roughly $194,000 in prejudgment interest, the court entered judgment.

After unsuccessfully moving for a new trial, for a judgment notwithstanding the verdict, and to set aside or vacate the judgment, defendant timely appealed.

## DISCUSSION

Defendant challenges two limited aspects of the second trial proceedings. First, it contends the trial court erred in allowing Dr. Geiger to offer expert testimony even though he was not listed on plaintiff's expert witness designation. Second, it argues the court unwarrantedly instructed the jury with a special instruction proposed by plaintiff concerning certain notice requirements under FMLA/CFRA. We find no reversible error. Defendant failed to preserve the former issue for appeal, and even if it had done so, the argument would fail on the merits. As to the latter issue, defendant fails to demonstrate prejudice.

## I.

### TREATING PHYSICIAN TESTIMONY

It is undisputed Dr. Geiger is a physician who treated plaintiff for his initial injuries incurred after a patient attacked him, as well as the lasting impacts during the many ensuing years. It is also undisputed plaintiff did not include Dr. Geiger on the expert designation list he provided to defendant in advance of trial, and at no time did plaintiff attempt to make a late designation of Dr. Geiger. Defendant claims Dr. Geiger provided unexpected expert testimony during trial and the trial court failed to preclude him from doing so. We agree with plaintiff that defendant forfeited

11

its challenge by failing to timely object to the testimony with the requisite specificity.

Among Dr. Geiger's direct examination testimony which defendant characterizes as expert opinion is the following:

"[Q]     Can you please explain to the jury the link between depression and a back condition like Mr. Albrecht had through and including the last you saw him in December of 2013?

A     So individuals that are depressed tend to focus on themselves and their pain, their situation. It can result in an individual sensing a higher level of pain and loss of motivation and creating a [*sic*] impression of high levels of perceived pain."

"Q     Okay. So can you please explain to the jury what is the vicious cycle that back pain sufferers like Mr. Albrecht go through in relation to their emotional state?

A     So when one loses function, it causes a lack of esteem and depression. The transition from being able to perform at a certain level of function in life and that loss of function can result in an individual being depressed. . . . [¶] . . . [¶] As a result of the depression, individuals perceive increasing pain. They tend to lose even more function, which causes a cycle of increasing levels of depression."

"Q     Dr. Geiger, is it true that stress makes a condition like Mr. Albrecht's worse? [¶] . . . [¶]

[A]     In my opinion, stress makes the -- a perception of pain and disability worse. And as a result, it results in progressively worsening function."

"Q     So why does stress cause that progressively worsening function? If stress is just, you know, life kicking us in the pants,

12

why does that -- it's not physical. Why does that make a physical condition worse? [¶] . . . [¶]

[A] There is a mind-pain connection that I think we can all appreciate. When one's depressed, again, there's a loss of -- increased perceived pain levels and loss of motivation. And one's mental status is important in regaining motivation to overcome physical ailments, for rehabilitation, and just to get up in the morning and overcome the daily pains that one has to endure."

Prior to Dr. Geiger's testimony that day, and outside the jury's presence, defense counsel raised concern about what they perceived to be the direction of Dr. Geiger's testimony. They believed Dr. Geiger would be used as an expert and communicated an objection to the trial court: "[Dr. Geiger] was a treating physician. In terms of what I'm aware of I think he last saw [plaintiff] in 2014. [¶] So to the extent that he's being offered as an expert or is relying on things other than his own records, we would seek to exclude that – those opinions and that evidence." In response to a question from the court about the scope of Dr. Geiger's testimony, plaintiff's counsel stated, in relevant part, "There will be some discussion about the interplay between depression, anxiety, and the back condition, which is something he was noting in his records back at the time, in 2012 and in 2013."

The court determined it would need to hear the specific questions and objections before ruling, so it instructed the parties to proceed. As the questioning moved forward, defense counsel interposed various objections. The only one that could potentially have been expert related was "calls for an improper opinion." Each time that objection was raised to a question targeted in this appeal, the court overruled it.

13

Evidence Code section 353 provides two criteria that must be met for a verdict or finding to be set aside, or a judgment or decision reversed, due to an erroneous admission of evidence. The one critical here is there must have been a timely objection, or motion to exclude or strike, the evidence "stated as to make clear the specific ground of the objection or motion." (Evid. Code, § 353, subd. (a).) "The purpose of this rule is to give the trial court a concrete legal proposition to pass on, to give the opponent an opportunity to cure the defect, and to prevent abuse." (*People v. Homes* (2012) 212 Cal.App.4th 431, 436.)

Identifying something as an "improper opinion" is a broad objection. Without more, it is not specific enough to make the court aware of why one believes the opinion to be improper. Although we disagree with plaintiff that a statutory citation is always required, there must be sufficient specificity to allow opposing counsel to meaningfully respond and the trial court to intelligently determine the objection's validity. (*People v. Ramos* (1997) 15 Cal.4th 1133, 1172 (*Ramos*).)

The need for specificity beyond "improper opinion" when raising an objection based on a failure to designate a witness as an expert is apparent. Designation of expert witnesses is part of the discovery process (Code Civ. Proc., § 2034.210), and Code of Civil Procedure section 2034.300 provides a discovery related remedy for situations in which a party fails to designate someone as an expert in response to a proper demand from another party. The statute requires that a party desiring to have certain testimony excluded must affirmatively show it "completely and timely" complied with its expert witness exchange obligations under Code of Civil Procedure section 2034.260. (*Id.* at § 2034.300.) And, as relevant here, it must also show the

other side "unreasonably failed" to list the witness in a demanded expert witness designation. (*Ibid.*)

An "improper opinion" objection lacks reference to any of these things. It leaves the trial court without information necessary to determine the objection's validity and to consider potential appropriate alternative discovery remedies tailored to the situation. (See, e.g., *Kennemur v. State of California* (1982) 133 Cal.App.3d 907, 920 [after hours deposition during trial is potential remedy for nondisclosure of expert].) It also hinders the development of an adequate record for appellate review. (See *Ramos, supra*, 15 Cal.4th at p.1172 [Evidence Code section 353 specificity requirement facilitates development of adequate appellate record].) An appellate court cannot determine whether a trial court abused its discretion when the lower court was never asked to exercise its discretion under the applicable statute. (See *Krolikowski v. San Diego City Employees' Retirement System* (2018) 24 Cal.App.5th 537, 570-571 [abuse of discretion review applies to court's determination concerning Code of Civil Procedure section 2034.300 objection].)

In this case, at no point before or during trial did defendant notify the court that it demanded from plaintiff a disclosure of expert witnesses, that plaintiff provided a designation, that he did not include Dr. Geiger in it, or that his failure to do so was unreasonable. It was not until defendant's motion for a new trial that it raised the failure to designate issue and provided the court with a copy of plaintiff's expert witness designation. That was too late to preserve the challenge for appellate review. (See *People v. Lucas* (1995) 12 Cal.4th 415, 462 [challenge to evidence admissibility raised for first time in new trial motion is untimely]; *Crouch v. Trinity Christian Center of Santa Ana, Inc.* (2019) 39 Cal.App.5th 995, 1020 [failure

15

to make contemporaneous, specific evidentiary objection at trial forfeits challenge to evidence on appeal].)

In any event, defendant's argument fails on the merits. A court cannot abuse its discretion by excluding contested evidence when a party fails to support its objection with appropriate evidence or authority. That was the case here.

## II.

### ALLEGED INSTRUCTIONAL ERROR

Defendant asserts the trial court erred in utilizing one of the CFRA/FMLA related special jury instructions proposed by plaintiff because it was irrelevant given the evidence adduced at trial and it led to jury confusion. In conjunction with this argument, it asserts the court erred in refusing to consider a declaration from one of the jurors which purportedly claims demonstrates the instruction misled the jury. We do not reach the latter argument because even if we were to find the court erred in giving the instruction and the jury was misled by it, defendant has not shown the requisite prejudice, all circumstances considered.

The challenged special jury instruction, given over defendant's objection, read as follows: "An employee does not need to expressly assert rights under FMLA or even mention FMLA to put the employer on notice. The employee only must state the reason the leave is needed, such as, for example, the expected birth of a child or for medical treatment, along with the anticipated timing and duration of the leave. The employer should inquire further of the employee if necessary to determine whether the employee is requesting FMLA leave and to obtain necessary information concerning the leave."

16

Both sides agree this language stems from portions of a California regulation concerning CFRA leave. (Cal. Code Regs., tit. 2, § 11091, subd. (a)(1).) However, they disagree about the meaning of the regulation and, in turn, the meaning of the instruction.

Defendant contends the described notice standards and responsibilities only apply to an initial invocation of the need for FMLA leave, not the use of such leave once a qualifying reason is approved by an employer. From this premise, it argues providing the instruction was error because it was inapplicable given the state of the evidence; "the evidence established that UCI gave [plaintiff] more than adequate notice of his right to request CFRA/FMLA leave." And, so its argument goes, the jury could have wrongfully interpreted the jury instruction language to place the legal inquiry burden on UCI for each instance of plaintiff's purported use of the approved intermittent FMLA leave.

Plaintiff begins from a different legal premise. He argues the state regulation from which the jury instruction language was adopted places the burden on the employer, under all circumstances, to investigate whether a requested absence is for FMLA qualifying reasons and, if so, to designate it as such. His counsel incorporated that premise into the closing argument made to the jury: "This is an actual instruction and this relates to the argument that the defense is making with regard to, okay, but when he called he didn't say FMLA. . . . [¶] . . . [¶] But say, oh, well, he didn't say FMLA, that's not the law, you're going to hear this tomorrow. There are no magic words. They don't even need to assert FMLA. All they need to do is say they need it. And then these are the key words: the employer should inquire. Hello. The employer should inquire. Remember Miss Martin's testimony? She's like, I don't like to ask questions. I don't want to know. That's the exact

17

wrong approach to FMLA. The employer is supposed to inquire instead of running away with a misapprehension [¶] . . . [¶] And that's why it doesn't matter when they say, we did not know at the time he called in. . . . He didn't say FMLA. This is just the biggest red herring of all."

Even assuming, arguendo, defendant's legal interpretation of the disputed regulation is correct, we are not persuaded by defendant's claim of prejudice. (*Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 983 [appellant bears burden of showing erroneous jury instruction was prejudicial].) In this respect, we look to the record to determine if it is reasonably probable defendant would have obtained a more favorable result absent the purported error. (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 801; *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 574.)

From a liability perspective, the challenged instruction could not have had any impact on two out of three theories of liability, namely age and disability discrimination. The trial court separately instructed as to each of those discrimination theories, with those instructions specifying elements not linked in any way to the disputed instruction or CFRA/FMLA generally. And, the jury returned a separate special verdict finding that plaintiff's age or physical condition was "a substantial motivating reason for UCI's decision to subject [plaintiff] to [an] adverse employment action[]," as well as that such action was a substantial factor in causing plaintiff's harm.

Pursuant to the special verdict form, even if the jury found no liability based on FMLA retaliation, the discrimination findings in plaintiff's favor would have required the jury to evaluate UCI's "same decision defense" and, if rejected, determine the amount of plaintiff's damages. Thus, defendant's argument that it "presented a very strong case that UCI did not retaliate against [plaintiff] for taking CFRA/FMLA leave" is of no moment.

18

Equally irrelevant is defendant's reliance on the unanimous defense verdict in the first trial, a trial which concerned different claims and theories.

Defendant notes that plaintiff "often gave conflicting and contradictory reasons" for his absences and it asserts "none of the absences that led to his termination involved CFRA/FMLA leave." It took the same position at trial, arguing plaintiff's claims of FMLA qualifying absences should not be believed and the reason for plaintiff's termination was the violation of UCI's attendance policy due to many unexcused absences. But, the jury necessarily rejected defendant's urgings when it concluded UCI's absence policy was not a substantial motivating reason behind plaintiff's termination. Defendant does not argue the challenged instruction could have impacted the jury's conclusion in that regard.

The question remains whether it is reasonably probable the jury's damages calculation would have been lower had the challenged instruction not been given. Defendant makes no argument on this point, and we do not discern from the record that there is such reasonable probability. Among other things, the damages related instructions specified each item of damages could only be awarded once irrespective of the number of legal theories on which the jury found liability.

In sum, defendant's failure to demonstrate prejudice from the alleged instructional error defeats its challenge to the CFRA/FMLA notice related jury instruction. Given that our prejudice conclusion is based on defendant's liability and damages irrespective of any mention of CFRA/FMLA, we need not reach defendant's argument about the trial court's exclusion of a juror declaration which it believed shows that the jury was misled by the instruction.

19

## DISPOSITION

The judgment is affirmed. Plaintiff is entitled to costs on appeal.


DELANEY, J.

WE CONCUR:


MOORE, ACTING P. J.


GOETHALS, J.